619 A.2d 497 (1992)
In re J.M., Appellant.
No. 90-FS-183.
District of Columbia Court of Appeals.
Argued En Banc February 28, 1992.
Decided December 30, 1992.
C. Edward Shacklee, appointed by the court, for appellant.
Rosalyn Calbert Groce, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corp. Counsel, and Charlotte M. Brookins, Asst. Corp. Counsel, were on the brief, for appellee.
*498 James Klein, for amicus curiae the Public Defender Service.
Elizabeth Trosman, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Shanlon Wu, Asst. U.S. Attys., were on the brief, for amicus curiae U.S.
Before ROGERS, Chief Judge, FERREN, TERRY, STEADMAN, SCHWELB, FARRELL, WAGNER, KING, and SULLIVAN, Associate Judges, and MACK, Senior Judge.

ON REHEARING EN BANC
FARRELL, Associate Judge:
On reconsideration by the court en banc, we have decided to remand this case for explicit findings by the trial judge with respect to the key factual issue presented, namely, the bearing of appellant's age fourteen at the time of his arrestupon the voluntariness of his consent to the search of his person.

I.
Appellant was adjudicated delinquent based upon a finding that he had possessed cocaine with intent to distribute it (D.C.Code § 33-541(a) (1988)). Prior to trial, he moved to suppress the cocaine on grounds that it had been seized from him in violation of the Fourth Amendment. At the hearing on the motion, the facts established were essentially as follows. On October 31, 1989, Detective Donald Zattau and a team of Metropolitan Police officers were at the Greyhound-Trailways bus station in Northeast Washington, D.C. Their assignment was to question, and presumably search if they had cause or obtained consent, passengers arriving in or passing through Washington from New York City. At about 2:30 a.m. a bus arrived from New York en route to Wilmington, North Carolina. After the driver announced a ten-minute rest stop, Detective Zattau and two other officers boarded the bus dressed in civilian attire. Using the bus speaker system, Zattau announced their identity and purpose, explaining that they were part of a drug interdiction group that interviewed passengers arriving from New York because it was a "source supply of drugs," and in the past they had found that drugs were transported by bus passengers. After questioning other passengers, Zattau approached J.M., who was seated three-quarters of the way to the rear next to a window.
The detective introduced himself and, in a conversational voice, asked J.M.'s point of origin and destination and if he could see his bus ticket; he also asked if J.M. had heard the announcement over the speaker system, to which the youth replied that he had and understood it. Zattau asked if J.M. was carrying drugs or weapons, and when J.M. replied no, the detective asked if he could search the bag J.M. was carrying with him. J.M. consented, and the search revealed nothing. Zattau then asked if J.M. had drugs or weapons on his person; when J.M. said no, the officer asked if he would mind if he patted him down. In response J.M. turned toward the officer and raised his arms while still seated. Zattau patted him down and felt a hard object on his right side next to his rib cage. He lifted the shirt and discovered a plastic bag containing crack cocaine taped to J.M.'s body. J.M. was arrested.
J.M. testified that he was fourteen years old at the time of his arrest and fifteen at the time of the trial one and a half months later. He lived in Brooklyn, New York, and attended ninth grade. He acknowledged that he had consented to the search of his bag because he knew it contained nothing illegal and feared that if he did not consent, the police would become suspicious and investigate. He denied, however, that he had given Zattau permission to frisk him, asserting that the officer "just started patting me down." He made no effort to stop the frisk because if he had done so, the officers "would have got[ten] more suspicious at me."
In justifying the search, the government did not claim that Detective Zattau had reason to suspect appellant of a crime, but instead argued that there had been no seizure of his person within the Fourth *499 Amendment since he had freely consented to the pat-down. Appellant, by contrast, argued that he had been seized without articulable suspicion because a reasonable person in his shoes would not have felt free to reject the officers' request. He argued, in addition, that under the totality of the circumstances his consent to the search was involuntary because he was fourteen years old at the time and "was traveling alone[,] and certainly under those circumstances, alone, black, barely a teenaged youth, would feel pressure when the police came up to him."
The trial judge denied the motion to suppress. He found, first, that J.M. had not been seized within the meaning of the Fourth Amendment merely because he was approached and questioned, and his consent to a search obtained, in the close confines of a bus interior, when there was no indication that the actions of Detective Zattau had overborne appellant's will. The judge further credited Zattau's testimony that he had asked for and received J.M.'s permission before patting him down, and found that the consent was voluntary. "[C]onsistent with his desire to deflect suspicion from himself," the judge reasoned, J.M.
turned to the officer and cooperated and raised his hands and I think hoped that by golly, maybe he won't find it.... [J.M.] consented to everything that went right up and down the line.... [J.M.'s consent] was part of the pattern of his whole reaction to the situation that was in front of him.
With respect to the failure to advise J.M. that he could withhold his consent, the judge stated that he thought "the law is clear" that the detective was "not obliged, in fact, to undercut his effort by saying, oh, you don't have to answer any questions, you can walk away from me immediately, you can in fact ignore me and, indeed, I would advise you to do that." Significantly (in light of our discussion later), while concluding that J.M. had consented in order "to deflect suspicion from himself," the judge did not link this conclusion to any express findings about J.M.'s maturity or sophistication for his age, as shown by his conduct at the time of the search or his testimony and demeanor at the hearing. The judge did recognize that, even in the case of adults, "in these types of encounters... there is an inherent authority, obviously, that the officer carries with him when he is conducting this kind of an interview and asking to search a bag," but found that this authority had not coerced J.M. into consenting against his will.

II.
We confront in this case two conceptually distinct yet, in practice, often overlapping issues. First, at the time Detective Zattau asked for and received appellant's consent to a pat-down search, did the totality of the officer's conduct amount to a seizure under the Fourth Amendment? Second, assuming appellant was not seized, was his consent to the pat-down voluntary so as to make the search reasonable under the Fourth Amendment? Florida v. Jimeno, ___ U.S. ___, ___, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). There will be instances, exemplified by this case and Florida v. Bostick, ___ U.S. ___, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), where the overlap of these issuesand the congruence between the tests governing their resolutionis nearly complete. Nevertheless, we agree with the United States Court of Appeals for the District of Columbia Circuit that, "[a]lthough there is overlap in these tests, they are not identical," United States v. Maragh, 282 U.S.App.D.C. 256, 261, 894 F.2d 415, 420 (emphasis by court), cert. denied, 498 U.S. 880, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990).[1] The "crucial test" *500 for determining whether a person has been seized "is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would `have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Bostick, ___ U.S. at ___, 111 S.Ct. at 2387 (emphasis added) (quoting California v. Hodari D., ___ U.S. ___, ___, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991)). By contrast, the issue of whether a person freely consented to a search "focuses on the particular individual rather than on a hypothetical reasonable person." United States v. Lewis, 287 U.S.App.D.C. 306, 313, 921 F.2d 1294, 1301 (1990). In that inquiry, all of the circumstances must be considered including both the nature of the police conduct and "the possibly vulnerable subjective state of the person who consents," Schneckloth v. Bustamonte, 412 U.S. 218, 229, 93 S.Ct. 2041, 2049, 36 L.Ed.2d 854 (1973), as "[t]he very object of the inquiry... [is] the nature of a person's subjective understanding." Id. at 230, 93 S.Ct. at 2049.
Given the overlapping but distinct nature of these two inquiries, this court has consistently applied a different standard of review in resolving them. We have reviewed the determination of seizure as a question of law de novo, Guadalupe v. United States, 585 A.2d 1348, 1352 n. 7 (D.C.1991), although "defer[ring] to the trial judge's findings of fact unless clearly erroneous." Id. But in light of the Supreme Court's repeated emphasis that the voluntariness of a consent to search is "a question of fact to be determined from all the circumstances," Schneckloth, 412 U.S. at 248-49, 93 S.Ct. at 2059; id. at 227, 93 S.Ct. at 2047, we have considered ourselves "bound to uphold the trial court's finding that a search was consensual unless such a finding is clearly erroneous." Kelly v. United States, 580 A.2d 1282, 1288 (D.C. 1990) (quoting Childress v. United States, 381 A.2d 614, 618 (D.C.1977)); see also D.C.Code § 17-305(a) (1989).
We adhere to this distinction today. No party before us, including the two amici, has urged a change in the standard of review concerning the seizure issue, and we are not persuaded there is reason to depart from our present standard. See United States v. Maragh, 282 U.S.App. D.C. at 258, 894 F.2d at 417 ("seizure" inquiry a question of law); but see id. at 262-63, 894 F.2d at 421-22 (Mikva, J., dissenting) (question whether police seized person "essentially factual" and should be reviewed under clearly erroneous standard). On the other hand, amicus the Public Defender Service urges that, in light of two recent Supreme Court decisions, Miller v. Fenton, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), and Florida v. Jimeno, supra, the issue of consent under the Fourth Amendment henceforth must be viewed as a question of law to be reviewed by the appellate court de novo (with deference to the trial court as to secondary or subsidiary issues of fact). Though this argument is made forcefully, we reject it.[2] *501 Until the Supreme Court signals plainly that the voluntariness of consent for Fourth Amendment purposes is no longer an issue of fact to be reviewed under the clearly erroneous standard, we shall continue to ally ourselves with every federal court of appeals in applying that standard of review.[3]

III.
We first conclude that J.M. was not seized when Detective Zattau asked him questions and asked permission to search his bag and then pat him down. In reaching that conclusion, we do not on this record consider the fact that J.M. was fourteen years old and hence possibly vulnerable to coercion in a way an adult would not have been.[4] We cannot do so because the Supreme Court has taught that the test for whether a person has been seized "is designed to assess the coercive effect of police conduct" (emphasis added), and that while that test
is flexible enough to be applied to the whole range of police conduct in an equally broad range of settings, it calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police. The test's objective standardlooking to the reasonable man's interpretation of the conduct in questionallows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment. 3 W. LAFAVE, SEARCH AND SEIZURE § 9.2(h), pp. 407-408 (2d ed. 1987 and Supp.1988). This "reasonable person" standard also ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached.

Michigan v. Chesternut, 486 U.S. 567, 573, 574, 108 S.Ct. 1975, 1979, 1980, 100 L.Ed.2d 565 (1988) (emphases added). As any susceptibility to coercion J.M. possessed by virtue of his age would relate to "the state of mind of the particular individual being approached," we must defer consideration of it to the separate issue, part IV, infra, of whether he voluntarily consented to the pat-down of his person.[5]
*502 In Kelly v. United States, supra, we stated that
[f]actors which might indicate a seizure would include, for example, the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.
580 A.2d at 1286 (citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (internal quotation marks omitted)). Except for the fact that here "several officers" were in the bus questioning passengers, none of these factors points to a seizure in this case. Appellant argues that the police effectively "commandeered" the bus by using the speaker system to announce their identity and purpose. But amplification of their message to avoid having to repeat it each time they approached a passenger is not, without more, the "use of language or tone of voice" in a coercive manner contemplated by Mendenhall. Appellant cites as proof that this "signal of authority and control" intimidated the passengers the fact that none of them (between 15 and 30) attempted to leave the bus during the ten-minute rest stop. But we do not know from the record where the last stop had been or where the next scheduled one was; indeed, we do not know whether there was a bathroom aboard the interstate bus. Hence we do not know whether anyone desired to leave the bus.[6] Although, unlike in Bostick, supra, the police did not tell J.M. that he was free to ignore their questions and request for permission to search, we concludeapplying the Supreme Court's "objective standard"that the totality of the police conduct was not so intimidating that a reasonable person would have felt incapable of "declin[ing] the officers' requests or otherwise terminat[ing] the encounter." Bostick, ___ U.S. at ___, 111 S.Ct. at 2387.

IV.
The conclusion that J.M. was not seized does not end the inquiry, however. When the police patted him down, there unquestionably was a search of his person, which the government seeks to justify on the ground that he voluntarily consented. Schneckloth, 412 U.S. at 219, 93 S.Ct. at 2043. When the issue is voluntariness of a consent, "characteristics of the accused" become relevant, id. at 226, 93 S.Ct. at 2047, and may even be decisive. Among the factors Schneckloth cited as significant are "the youth of the accused; his lack of education; or his low intelligence," id. (citations omitted); and related to these may be "the lack of any advice to the accused of his constitutional rights." Id. "[A]ccount must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." Id. at 229, 93 S.Ct. at 2049.
The factor in this case that has troubled the courtthe division from the beginning, a majority of the entire court more recentlyis the effect of appellant's age and maturity (or lack thereof) on his ability to consent voluntarily to the detective's request to frisk his body. We conclude that it is a factor critical to "the nature of [J.M.'s] subjective understanding" of his rights, id. at 230, 93 S.Ct. at 2049, and hence the validity of his consent under Schneckloth. But we also conclude that we cannot review the trial court's determination of consent on the basis of the findings addressing this factor so far.
The majority opinion for the division described at length the special concern our judicial system has had to protect juveniles from potentially overreaching police conduct. See In re J.M., 596 A.2d 961, 970-73 (D.C.1991), vacated, February 5, 1992. We need not repeat that discussion here. Sitting as the court en banc, we conclude that what the division correctly identified as the special vulnerability of juveniles to intimidation by figures of authority does not *503 justify a presumptive rule invalidating consents by juveniles. Schneckloth emphasized that the issue of consent involves "analyzing all the circumstances of an individual consent," 412 U.S. at 233, 93 S.Ct. at 2050; see id. at 248-49, 93 S.Ct. at 2059; and this "careful sifting of the unique facts and circumstances of each case," id. at 233, 93 S.Ct. at 2050, is incompatible with isolating any "single controlling criterion" such as age and imbuing it with presumptively decisive weight in the consent analysis. Id. at 226, 93 S.Ct. at 2047. Yet Schneckloth does indicate by analogy the proper scrutiny we think must be given the fact of age when the trial court decides an issue of consent by a juvenile. The Supreme Court noted (though without having to address the point) "that other courts have been particularly sensitive to the heightened possibilities for coercion when the `consent' to a search was given by a person in custody." 412 U.S. at 241 n. 29, 93 S.Ct. at 2055 n. 29 (citations omitted). As with the fact of custody, it seems to us almost self-evident that a trial judge deciding the issue of consent by a youth must be sensitive to the heightened danger of coercion in this setting. Correspondingly, our own responsibilities as a reviewing court permit us to require that in such cases the trial judge make explicit findings on the record concerning the effect of age and relative immaturity on the voluntariness of the defendant's consent. These findings (which need not be in writing) are particularly necessary when it is conceded, as in this case, that the youth was not told he could withhold consent, for even in the adult context the Supreme Court has explained that advice of that right may be "highly relevant" to the voluntariness issue and may "substantially lessen[ ] the probability that [the police] conduct could reasonably have appeared to [the person] to be coercive." United States v. Mendenhall, 446 U.S. at 559, 100 S.Ct. at 1879.
We have no doubt that the experienced trial judge in this case, assigned specially to the juvenile court, was familiar with the law of seizure and consent under the Fourth Amendment and the need to consider "the setting in which the [police] conduct occurr[ed]," Chesternut, 486 U.S. at 573, 108 S.Ct. at 1979, including the fact of J.M.'s youth. Nonetheless, we cannot properly discharge our review function on the basis of the findings apparent on the record. The judge, although aware J.M. was under fifteen at the time of the search, did not discuss this fact in explaining why the youth had voluntarily consented to the search. He did explain, after hearing testimony from Detective Zattau and J.M., that J.M. had acceded to the request "to deflect suspicion from himself" in the hope of avoiding detection. At the division level, the present writer was satisfied that this statementreflecting an assessment of J.M.'s demeanor and maturity only weeks after the eventsadequately supported the finding that J.M. had responded out of calculation and self-interest (though ill-advisedly) rather than intimidation and ignorance of his rights. See 596 A.2d at 978-80 (Farrell, J., dissenting).[7] The full court is now persuaded that this finding, to be sustainable, must be tied more closely to predicate findings by the judge about J.M.'s maturity and understanding of his rights. A desire to "deflect suspicion" from one-self by feigning cooperation may reveal sophistication and knowledge even by a fourteen-year-old, particularly one trusted to ferry a large amount of drugs by interstate transportation. But it may also reflect merely a belief by an inexperienced youth rightly conditioned, like most young people, to obey authority that a search will be conducted regardless of his consentso that his only real "choice" is to pretend cooperation.[8] Which of these hypotheses fits J.M.'s apparent cooperation must depend on an explicit evaluation of his maturity and knowledge in all the circumstances, *504 including as one factor the failure of the police to tell him he could refuse consent.[9]

V.
In conclusion, we reaffirm the standards of review we have heretofore applied to the issues of seizure and consent. We hold that appellant was not seized prior to the conduct of the pat-down search, but remand on the issue of consent. In doing so we reaffirm our recognition of the special ability of the trial court to decide issues of fact, including demeanor and credibility, and our willingness to defer to its judgment "where the facts admit of more than one interpretation." Davis v. United States, 564 A.2d 31, 35 (D.C.1989) (en banc). But this deference imposes an equal duty on the trial court to deal expressly and thoroughly with the significance of age before finding that a juvenile has consented to a search. We accordingly remand this case to the trial court for further consideration of that issue.
So ordered.
ROGERS, Chief Judge, with whom MACK, Senior Judge joins, dissenting, but concurring in the remand:
This appeal presents the court with an issue of first impression involving the constitutional rights of young citizens. The hypothetical "reasonable person" standard has been developed by the Supreme Court in the context of seizures involving adults, and to date the Supreme Court has not addressed whether or not the peculiarities associated with non-adult status of a seized person affect the proper examination of the totality of the circumstances.[1] The formula adopted by the Court to determine whether there has been a seizure, based on an assessment of the coercive effect of police conduct, is consistent with consideration of the effect of police conduct on the reasonable person who is a child.
The Supreme Court has explicitly adhered to a contextual approach in determining whether an adult has been seized when it has held that there is a single concept of a hypothetical "reasonable person" that is to be applied to everyone. See Michigan v. Chesternut, 486 U.S. 567, 573-74, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988).[2] In other words, the objective standard encompasses the particular circumstances with which the police officer is confronted. Therefore, it appears consistent with the teachings of the Supreme Court opinions that specific, objectively observable characteristics of the person who is the object of police conduct be considered by a court in determining whether a seizure has occurred. Consequently, I conclude that the majority's application of the hypothetical "reasonable person" test for adults to a child is misconceived. See majority opinion at Part III.
In articulating the objective reasonable person test, the Supreme Court has neither held nor implied that the circumstances in which the reasonable person finds himself or herself as objectively viewed by a police officer are irrelevant to the determination by the court of whether a seizure has occurred. Rather, as in Chesternut, supra, 486 U.S. at 572, 108 S.Ct. at 1978, the *505 Supreme Court stated that "any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account `all of the circumstances surrounding the incident' in each individual case." The Court has further explained that "what constitutes a restraint... will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." Id. at 573, 108 S.Ct. at 1979. It should follow, in applying Chesternut's recapitulation of the test, that a court must consider, as part of "the setting in which the conduct occurs," id. at 573-74, 108 S.Ct. at 1979, whether a reasonable person who is a child would have thought that he or she was free to leave under the circumstances. Here, specifically, a court must consider whether, in view of the infirmities, inexperience and ignorance inherent in being a child, a seizure has occurred where the child is an interstate bus traveler and the police officers, perceiving a child, act as they did in the instant case and fail to inform the child that he need not answer any questions nor submit to a search and is free to leave.
This approach is consistent with the Supreme Court's emphasis on the fact that the seizure test, while flexible, "calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police." Id. Police officers are trained to treat minors differently,[3] and in assessing the reasonableness of police conduct this court places emphasis on the extent of the officer's training and experience.[4]See Peay v. United States, 597 A.2d 1318, 1322 (D.C.1991) (en banc) ("`in judging the reasonableness of the actions of the arresting officer,' the circumstances `are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by experience and training.'") (quoting United States v. Young, 194 U.S.App.D.C. 377, 379, 598 F.2d 296, 298 (1979)). If a court is required to consider the setting in which the seizure of an adult occurs, it can do no less when a child is seized. Thus, the factual question is whether a reasonable, experienced police officer would have realized that J.M. was a child.
The majority asserts that "[a]s any susceptibility to coercion J.M. possessed by virtue of his age would relate to `the state of mind of the particular individual being approached,' this court must defer consideration of it to the separate issue ... of whether he voluntarily consented to the pat-down of his person." See majority opinion at 501. On the contrary, the "circumstances" inherent in being a child include generally recognized vulnerabilities and immaturities that the police may acknowledge without resorting to speculation about the state of mind of the particular juvenile being approached. The Police Department itself views age as an objective factor. See note 3, supra. As the Supreme Court has stated in another context:
[W]hen, as here, a mere childan easy victim of the lawis before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens.
Haley v. Ohio, 332 U.S. 596, 599-600, 68 S.Ct. 302, 303-304, 92 L.Ed. 224 (1948). Thus, to consider whether the "reasonable person" at issue is a child is not the same as considering the subjective state of mind of a particular child. Nor is it contrary to the Supreme Court's emphasis that the police must be able "to determine in advance whether the conduct contemplated will implicate the Fourth Amendment." Chesternut, *506 supra, 486 U.S. at 574, 108 S.Ct. at 1980.
Applying the "reasonable person" standard in a manner to recognize that a child could, in law, be deemed to have a different understanding of police conduct than an adult assures that young citizens are not denied constitutional protection by reason of their age and immaturity. In view of the position of authority occupied by the police in our society, it is readily conceivable that a child would conclude that he or she is not free to leave, when approached by a police officer, in the absence of the factors that the majority states are relevant in determining whether or not a seizure of an adult has occurred. See majority opinion at 502 (referring to "the threatening presence of several officers, the display of a weapon by an officer, some physical touching ... or the use of language or tone of voice indicating that compliance with the officer's request might be compelled") (quoting Kelly v. United States, 580 A.2d 1282, 1286 (D.C.1990)). While a trial court might find a level of sophistication or knowledge of the criminal justice system that belies a particular child's chronological age, there is nothing in the record before this court to support the conclusion that a child of fourteen or fifteen years of age would have the same reaction to police conduct or the same level of understanding of his or her constitutional rights as an adult.
In a variety of other contexts, the Supreme Court has recognized that there are occasions when the law must treat children differently than adults. Thus, in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Court declared that "the greatest care" must be taken to ensure that a confession by a juvenile, in the absence of counsel, "not only ... was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." Id. at 55, 87 S.Ct. at 1458; see also Haley v. Ohio, supra, 332 U.S. at 599-600, 68 S.Ct. at 303. Indeed, the Supreme Court acknowledged in Gallegos v. Colorado, 370 U.S. 49, 54, 82 S.Ct. 1209, 1212, 8 L.Ed.2d 325 (1962), that a fourteen year old boyJ.M.'s age"cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions."
Hence, the fundamental defect in the majority's seizure analysis arises from its failure to hold that "the setting," to be considered by a court in determining whether a seizure has occurred, encompasses the reasonable person as a child. In so doing, the majority ignores the Supreme Court's instruction that the totality of the circumstances must be considered. See Florida v. Bostick, ___ U.S. ___, ___, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991). Instead, it woodenly applies a standard developed for the hypothetical reasonable adult to a child. Put otherwise, the majority treats a child as a little adult, notwithstanding the Supreme Court's acknowledgement that a child's appreciation of constitutional rights is not equivalent to that of an adult. See In re Gault, supra, 387 U.S. 1, 87 S.Ct. 1428; Gallegos v. Colorado, supra, 370 U.S. 49, 82 S.Ct. 1209; Haley v. Ohio, supra, 332 U.S. 596, 68 S.Ct. 302; see also 3 W. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 8.2, at 32 (1991 Supp.). Cf. In re E.A.H., 612 A.2d 836, 839 (D.C.1992) ("juveniles are not simply younger adults") citing In re Owen F., 70 Md.App. 678, 523 A.2d 627, 630 & n. 3 (1987) ("in the case of a juvenile, courts are called upon to apply `a wider definition of custody for Miranda purposes'") (quoting In re Lucas F., 68 Md.App. 97, 510 A.2d 270, 273 (1986)). While the defect may be less glaring in the instant case because the majority concludes that the age of the child must be considered for purposes of determining consent to intrusive police action, the majority's analysis sanctions a deprivation of the constitutional rights of some citizens by declining to adopt a legal analysis which acknowledges that, in principle, the effects of police presence and police conduct may be quite different for a child than for an adult.[5]
*507 Accordingly, I would remand the case to the trial court because, although defense counsel argued that J.M.'s age was a significant factor that should be assessed in determining whether or not he was seized, the trial court's findings do not address J.M.'s age. Upon remand, the trial court must determine whether the police officer was aware, or should have been aware, in view of the immature physical appearance of J.M. or other factors, that he was confronting a child. If the trial court finds that the police officer knew, or should have known, that J.M. was a child, then the trial court must determine whether, in the circumstances, J.M. as a reasonable child would not have thought that he was free to leave. Absent circumstances to indicate a sophistication belying his young age, or other telling circumstances, the failure of the police to advise J.M. that he did not have to answer any questions or submit to a search and was free to leave should be determinative. See United States v. Mendenhall, 446 U.S. 544, 558-559, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980) (adult's knowledge of right to refuse to consent to a search "highly relevant" to determination that there had been consent); see also Bostick, supra, ___ U.S. at ___, 111 S.Ct. at 2385 (fact that police specifically advised Bostick, an adult, that he had the right to refuse consent "particularly worth noting").
SULLIVAN, Associate Judge, with whom WAGNER, Associate Judge, joins, concurring in part and dissenting in part:
Although I concur with the majority's analysis and resolution of the seizure issue, I disagree with its decision to remand this case for explicit findings as to the effect of appellant's age on the voluntariness of his consent to the search of his person. For the reasons set forth herein, I am of the opinion that the record is sufficient for this court to affirm the trial court's denial of appellant's suppression motion. See Peay v. United States, 597 A.2d 1318, 1320 (D.C. 1991) (en banc).
The majority's decision requires the trial judge to discuss appellant's age explicitly and to make predicate findings about appellant's maturity and understanding of his rights based solely on the fact that he was fourteen years old when the search occurred. The record developed before the trial judge, however, is devoid of any evidence that appellant's age, or immaturity and lack of understanding related thereto, prevented him from giving a valid consent. Consequently, appellant failed to preserve the issue as a basis for remand of the case for further findings, since he offered neither proof of facts nor a substantiated proffer of same. See In re R.E.G., 602 A.2d 146, 148 (D.C.1992).
We held recently that we will not disturb a trial court's ruling denying a motion to suppress evidence in the absence of "proof, or ... even a proffer that [the defendant] had any mental or intellectual deficiency or was otherwise unable to give a valid consent." Kelly v. United States, 580 A.2d 1282, 1289 (D.C.1990). Although the government had the burden of proving whether or not appellant's consent was voluntary, Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973), Kelly makes clear that where a defendant does not produce "legal or factual support" for an assertion that he was unable to give a valid consent, the trial court's ruling should not be disturbed. Kelly, supra, 580 A.2d at 1289 (emphasis added).
A minor's age alone is not enough to preclude a finding of valid consent. Commonwealth v. Maxwell, 505 Pa. 152, 477 A.2d 1309, 1315, cert. denied 469 U.S. 971, 105 S.Ct. 370, 83 L.Ed.2d 306 (1984), and cases cited therein. This principle of law *508 has been applied in cases involving individuals ranging from eight through seventeen years of age.[1] In the present case, however, appellant's counsel elicited testimony only as to appellant's age and grade in school. Appellant's counsel neither offered proof nor made a substantiated proffer of appellant's immaturity, lack of understanding, or any other age-related factor which would negate his ability to give a valid consent. Cf. United States v. Hall, 969 F.2d 1102, 1104-05 (D.C.Cir.1992) (affirming trial court's finding that consent was voluntary notwithstanding testimony of defendant that she participated in special education programs and testimony of a psychologist that defendant's "cognitive intellectual functioning" and her "borderline personality disorder" precluded a voluntary consent).
Although appellant's attorney stressed in closing argument that appellant's consent to the search was involuntary because of his age, counsel's argument was not a substitute for evidence of a claimed lack of maturity or inability to consent. See Fletcher v. United States, 335 A.2d 248, 250 (D.C.1975) (argument of counsel is not evidence); (John L.) Jackson v. United States, 329 A.2d 782, 790 (D.C.1974). See also Daniels v. United States, 613 A.2d 342, 348 (D.C.1992) (Schwelb, J., concurring). Even if counsel's argument were construed to be a proffer, "[a] mere [unsubstantiated] proffer is not evidence." In re R.E.G., supra, 602 A.2d at 148; see also (Darryl) Jackson v. United States, 589 A.2d 1270, 1271 (D.C.1991).
In a case strikingly similar to the present case, a Pennsylvania appellate court held:
We have examined the record and have found no evidence to support a finding that Jermaine[, a sixteen-and-a half-year-old whose bag was searched by police officers on drug interdiction duty in a public railroad station,] was emotionally or mentally immature so as to be incapable of giving valid consent for the police to search her bag. To believe otherwise is to discount entirely the fact that the juvenile was sufficiently mature to purchase a train ticket in New York and travel alone to Philadelphia.
In re Jermaine, supra note 1, 582 A.2d at 1064 (citing Commonwealth v. Maxwell, supra, 477 A.2d at 1315) ("consent to search house given by sixteen-year-old was valid where record was devoid of any evidence of emotional immaturity or mental instability and indicated to the contrary that decision was rational").
In the present case, appellant, only thirty-two days shy of his fifteenth birthday, bought a bus ticket for the trip from New York to Wilmington, North Carolina, traveled alone and arrived at the Greyhound bus station in Washington, D.C. at 2:30 in the morning, was aware of the drug traffic from New York to Wilmington, knew that police officers are always armed, even when their guns are not visible, and revealed by his testimony that he consciously took steps to deflect suspicion from himself.[2] In sum, when all the surrounding circumstances are considered, there is no evidence in the record to support a finding that appellant was emotionally or mentally *509 immature so as to be incapable of giving a voluntary consent for the police to search him. Indeed, the only relevant evidence in the record supports the trial court's finding that appellant was capable of giving a voluntary consent. See Schneckloth, supra, 412 U.S. at 226, 93 S.Ct. at 2047; In re Jermaine, supra, 582 A.2d at 1064.
Consistent with the holding of Schneckloth, supra, 412 U.S. at 226, 93 S.Ct. at 2047, the experienced trial judge, presiding over juvenile proceedings, assessed the demeanor of the witnesses, evaluated the totality of the circumstances surrounding the consent to search, made a credibility determination in favor of the government, and held that appellant's consent was voluntarily given.[3]See id., 412 U.S. at 227, 93 S.Ct. at 2047 (voluntariness of consent to search is a question of fact determined from the totality of the circumstances); see also In re Jermaine, 582 A.2d at 1064 (although a factor, age alone does not preclude voluntary consent).
Viewing the facts and all reasonable inferences therefrom in favor of sustaining the trial court's ruling denying appellant's motion to suppress evidence, as we must, Peay, supra, 597 A.2d at 1320, it is clear that the trial court's ruling is supported by the evidence, is not clearly erroneous, and should be affirmed. D.C.Code § 17-305(a) (1989); Kelly, supra, 580 A.2d at 1288. See also Childress v. United States, 381 A.2d 614, 618 (D.C.1977). I, therefore, respectfully dissent from the majority's decision to remand this case for further findings.

I.
MACK, Senior Judge, dissenting, but concurring in the order of remand:
As a matter of law, I would have concluded that J.M. was seized when cornered by drug interdiction officers on board the bus. Moreover, even accepting the facts as developed at trial, I could not have concluded that J.M. freely consented to an intrusive body search. With the issue of consent still open, however, I want to go on record as agreeing with my colleagues that, on remand, the trial court must consider J.M.'s youth. Moreover, to speak the "unspeakable,"[1] the trial court should also consider the fact that J.M. was a fourteen year old black youth who had no previous involvement with the criminal justice system and who had not been advised that he could walk away or refuse to answer.
In our preoccupation with standards of review with respect to "two conceptually distinct yet, in practice, often overlapping issues,"[2]i.e., whether there has been seizure and/or consent for Fourth Amendment purposes, we must not lose sight of the fact that, regardless of the applicable standards, judges at both the trial and appellate levels must rest any decisions on the "totality of [factual] circumstances."[3] This is true whether those circumstances *510 are objective only,[4] or both objective and subjective.[5] In my view, J.M. was seized when cornered by police in the early morning hours of October 31, 1989. I cannot find that a reasonable person, even an innocent person,[6] (in the circumstances in which J.M. found himself) would feel "free to decline the officers' request or otherwise terminate the encounter" in the physically confining interior of an interstate bus commandeered by armed drug interdiction officers at 2:00 a.m. for the purpose of conducting interviews during a rest stop.[7]See Florida v. Bostick, supra note 1.

II.
As to the consent issue, I read both Miller v. Fenton, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) and Florida v. Jimeno, ___ U.S. ___, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), to hold that consent is a question of law for the appellate court, deferring to the trial court's findings on secondary or subsidiary issues (of fact). I do not belabor the point because I do not rely upon what I perceive here to be an impermissible seizure to question the validity of any subsequent consent to search.[8] The coercive nature of the setting, coupled with other facts established by trial testimony, leads me to conclude that the trial court's finding of J.M.'s free and voluntary consent was at least clearly deficient, and at most clearly erroneous. See Kelly v. United States, 580 A.2d 1282 (D.C.1990).
For the average law-abiding citizen, the idea of having police officers conduct a "pat down" body search in public is a disconcerting one. It is safe to surmise, and the Corporation Counsel so argued, that this thought would be even more disconcerting to a person with cocaine strapped to his body. For distinctly different but equally compelling reasons, this court should review with "the most careful scrutiny" all the surrounding circumstances attendant to a finding of consent, especially when the search cannot be justified by probable cause or articulable suspicion. See Schneckloth v. Bustamonte, supra, 412 U.S. at 229, 248, 93 S.Ct. at 2048, 2058; see also United States v. Blake, 888 F.2d 795 (11th Cir.1989).
The conclusion that J.M. freely consented because he did not want to make the searching officer suspicious, culled from a scenario generated by the prosecutor during J.M.'s cross-examination and reiterated in the trial court's reasoning, fails to comport with the reality of human experience, with the record in this case, and with the law of consent as I see it. In my view, this finding cannot be sustained.
When the government seeks to rely upon consent to justify the lawfulness of a search, the government bears the burden of proving that the consent was, in fact, freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968). Voluntariness is a question of fact to be determined from the totality of all the circumstances, including the characteristics of the accused, the details of the interrogation, and the failure to advise the accused of his constitutional rights. See Schneckloth, supra, 412 U.S. at 226, 227, 93 S.Ct. at 2047, 2048. Only after a careful sifting through the unique facts and circumstances of each case can such a determination be made. If it appears that the consent was not given voluntarilythat it was coerced, or granted only in submission to a claim of lawful authoritythe consent is invalid and therefore the search is unreasonable. Id. at 233, *511 93 S.Ct. at 2050. Voluntariness traditionally has taken into account, inter alia, such evidence as a suspect's minimal schooling, low intelligence and lack of effective warnings to a suspect of his rights. Id. at 248, 93 S.Ct. at 2058; see also Florida v. Bostick, supra, ___ U.S. at ___, ___, 111 S.Ct. at 2382, 2385 (the fact that the accused had been informed of his right to refuse consent was considered "worth noting"). Moreover, personal characteristics of the accused such as age, sex, race and even widowhood have been worth noting in the assessment of coercion. See Mendenhall, supra, 446 U.S. at 558, 100 S.Ct. at 1879; see also Bumper, supra, 391 U.S. at 546, 88 S.Ct. at 1790.
In the instant case, there was no evidence of verbal or written consent to a body search.[9] Detective Zattau, a member of the elite "drug interdiction" team described by the trial judge as "well-trained and experienced",[10] conceded his awareness that consent would be a major legal question arising from his drug interdiction duties. The detective also testified that if a subject refused to permit a search of luggage or submit to a "pat-down," the officer could go no farther "at that point." Yet, the detective conceded that he did not share this information with J.M. and the other passengers on the bus. He testified that, after receiving J.M.'s permission to search his luggage and finding no drugs therein, he asked J.M. whether he was carrying any drugs or weapons on his person and J.M. said "no." More significantly, Detective Zattau testified that when he asked J.M. if he would "mind" a "pat-down," J.M. did not say anything. J.M. gradually turned his body in the officer's direction and raised his arms.[11] Asked why he raised his hands, J.M. replied "[b]ecause, you know, I had no other choice but to." J.M. said that he "was feeling kind of afraid," that he did not believe that he could walk off the bus, and that he knew the officers were armed even though Zattau did not display his gun (as did Zattau's partner who was then stationed behind J.M.).
It was the government's cross-examination that broached the subject of J.M.'s "cooperation," suggesting that J.M. was making efforts to avoid conduct that would make the police "suspicious." After having tried unsuccessfully to obtain an admission from J.M. that the drugs were taped to a particular location on his body in order to attract less attention, the prosecutor asked J.M.:
[PROSECUTOR]: You had no intention of stopping him from patting you down, did you?
[J.M.]: No, because if I would have tried to, he would have got more suspicious of me.
Whatever J.M. meant by this answer to a series of leading questions, it appears that he was not admitting that he freely consented to the search. Rather, J.M. was explaining why he did not resist an officer who he said was already searching him (his luggage and his person) on a bus where egress was impossible. In this coercive environment, J.M.'s raising of his arms may have been no more than his submission to authority or succumbing to fear of the consequences of refusal. See Mendenhall, supra, 446 U.S. at 559, 100 S.Ct. at 1879; Bumper, supra, 391 U.S. at 548-49, 88 S.Ct. at 1792; United States v. Alexander, 755 F.Supp. 448, 452 (D.D.C.1991).
It is against this backdrop that the oral findings of the trial court must be measured. After rejecting J.M.'s argument as to seizure primarily on the ground that the *512 detective was not overbearing,[12] the court turned to the issue of consent. Beginning with the question of whether Detective Zattau had asked J.M. if he could pat him down (a fact J.M denied), the court credited the officer in the context of this case and in the context of his training, suggesting that J.M. might have forgotten or not heard the officer, adding:
Be that as it may, I do credit the detective that he asked to do a pat-down and that [J.M.] consistent with his desire to deflect suspicion from himself turned to the officer and cooperated and raised his hands and I think hoped against hope that by golly, maybe he won't find it.
The court, further noting that the officer "did find it," said that it felt "comfortable finding that [J.M.] consented to everything that went right up and down the line." The court said it believed that J.M. had consented to a pat-down and that it "would be willing to bet" that, if the facts were different, J.M. would have consented. "It was part of the pattern of his whole reaction to the situation that was in front of him."
One defers to the trial court's assessment of credibility. For whatever reason, one might "believe," as the trial court believed, that J.M. consented to an intrusive search of his body. Is this, however, the kind of factual finding of consent to which this court wants to defer for Fourth Amendment purposes? This may well be one of those cases where the inquiries of seizure and consent overlap.[13] Under any standard of review, I see no voluntary consent on these facts and I would opt for reversal for the reasons stated so eloquently by Judge Schwelb at the division level.[14]
Because the majority remands this case so that the trial court can factor J.M.'s youth into the consent equation, I concur in the order of remand. I would hope, however, that a new overall appraisal of the question of consent could be made in view of this record. In this connection, J.M.'s counsel asked the trial court to note that J.M. was fourteen at the time of this encounter, arguing:
He was traveling alone and certainly under the circumstances alone, black, barely a teenage youth, would feel pressure when the police came up to him.
On remand, I would not want to impose upon the able trial court a formidable task of the centuries. It would be helpful to me, however, to have its appraisal of, not only whether the raising of J.M.'s arms in such a setting was in fact a consent,[15] but also what bearing such a setting might have on any non-verbal consent by a fourteen year old black male who had no previous involvement with the criminal justice system and who had not been advised that he could walk away or refuse to answer.
Whether the courts speak of it or not, race is a factor that has for many years engendered distrust between black males and law enforcement personnel. See Tracey Maclin, "Black and Blue Encounters"Some Preliminary Thoughts about Fourth Amendment Seizures: Should Race Matter?, 26 VAL.U.L.REV. 243 (1991); *513 see also Sheri Lynn Johnson, Race and the Decision to Detain a Suspect, 93 YALE L.J. 214 (1983). America's history in large measure may be responsible for this phenomenon; it is painful to remember the era when some local sheriffs, deputies, jailers, policemen and prominent citizens cooperated with purveyors of mob violence to provide punishment for blacks accused of crime. See Walter White, "I Investigate Lynchings," reprinted in THE NEGRO CARAVAN (Sterling A. Brown, et al. eds. 1941). (For enterprising researchers, who remain in doubt as to numbers, read the Congressional Record detailing unsuccessful attempts to introduce and pass anti-lynching legislation.) Even today, arrest statistics suggest, whatever the causes of crime, a litany of fear and distrust.[16] Sadly, in the interest of protecting the public, these statistics can be used negatively to justify unequal treatment and thus engender hostility. See generally Andrew Hacker, Two NATIONS, BLACK & WHITE, SEPARATE, HOSTILE, UNEQUAL (1992). To the extent that a "drug courier profile" (alluded to by the dissenting justices in Florida v. Bostick, supra) might embrace race, it becomes circular exercise in institutionalized stereotyping.[17] Our very diversity has always produced stereotyping which in turn has produced statistical data, which in turn has produced stereotyping.[18] This in turn makes it difficult for our courts to apply meaningful legal standards consistent with our Constitution. I respectfully venture to suggest that no reasonable innocent black male (with any knowledge of American history) would feel free to ignore or walk away from a drug interdicting team.[19] I *514 would also suggest that if this hypothetical man was neither innocent nor reasonable, and armed, the lives of innocent people might be endangered in the close confines of a bus.
The trial court was right when it suggested that J.M. would have consented to anything. The issue, however, is whether that consent was voluntary. In determining the voluntariness of J.M.'s consent, I would factor into the totality of the circumstances the relevant characteristics of age and race, as well as the fact that appellant was not told that he was free to decline to consent to the search. See Mendenhall, supra, 446 U.S. at 558, 100 S.Ct. at 1879, citing Schneckloth, supra, 412 U.S. at 226, 93 S.Ct. at 2046.
I concur in remand.
NOTES
[1] In Florida v. Bostick, supra, the Supreme Court considered the narrow question "whether a police encounter on a bus ... [during a scheduled stop] necessarily constitutes a `seizure' within the meaning of the Fourth Amendment." ___ U.S. at ___, 111 S.Ct. at 2386. Answering that question in the negative, the Court "remand[ed] so that the Florida courts may evaluate the seizure question under the correct legal standard," deciding "whether Bostick chose to permit the search of his luggage." Id. at ___, 111 S.Ct. at 2388. Nevertheless, the Court did not suggest that hencefortheven on facts similar to those in Bostickcourts are to apply a unitary test in deciding the separate issues of seizure and consent.
[2] Miller involved the issue of review under the federal habeas corpus statute of a state court's ultimate conclusion concerning the voluntariness of a confession. The Court held this was an issue of law to be considered by the federal courts de novo. However, the opinion leaves no question, in our view, that the Court regards the issue of voluntariness of confessions under the Due Process Clause of the Fifth Amendment as sui generis, both for historical reasons, 474 U.S. at 115, 106 S.Ct. at 452, and because of society's fundamental aversion to permitting a criminal defendant to be "the deluded instrument of his own conviction." Culombe v. Connecticut, 367 U.S. 568, 581, 81 S.Ct. 1860, 1867, 6 L.Ed.2d 1037 (1961) (citations omitted); Miller, 474 U.S. at 116, 106 S.Ct. at 452 (citing Culombe). Like the United States Court of Appeals for the Eighth Circuit, "[w]e do not believe that [the Miller] rule ... should or will be extended to voluntariness issues under the Fourth Amendment." United States v. McGinnis, 783 F.2d 755, 759 n. 2 (8th Cir.1986).

In Jimeno, the Supreme Court reaffirmed that "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of `objective' reasonablenesswhat would the typical reasonable person have understood by the exchange between the officer and the suspect?" ___ U.S. at ___-___, 111 S.Ct. at 1803-04 (emphasis added). This is not surprising: since a suspect infrequently explains in advance the scope of his consent, the test necessarily must be what a reasonable person would have understood his consent to be from the exchange with the officer. But Schneckloth (which the Court cited in Jimeno) made clear that whether a person has consented voluntarily is a question of fact incorporating both objective and subjective components, the object being to ascertain "the nature of a person's subjective understanding." 412 U.S. at 230, 93 S.Ct. at 2049. It would be remarkable if the Court in Jimeno, without a word suggesting it was doing so, meant to overrule Schneckloth's characterization of the voluntariness of consent as an issue of factone traditionally reviewed by appellate courts under a clearly erroneous standard.
[3] See United States v. Morgan, 286 U.S.App.D.C. 216, 219, 914 F.2d 272, 275 (1990); United States v. McMahon, 935 F.2d 397, 399 (1st Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 272, 116 L.Ed.2d 224 (1991); United States v. Oguns, 921 F.2d 442, 448 (2d Cir.1990); United States v. Kikumura, 918 F.2d 1084, 1093 (3d Cir.1990); United States v. Hummer, 916 F.2d 186, 189 (4th Cir. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1608, 113 L.Ed.2d 670 (1991); United States v. Lopez, 911 F.2d 1006, 1011 (5th Cir.1990); United States v. Blakeney, 942 F.2d 1001, 1016 (6th Cir.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992); United States v. Durades, 929 F.2d 1160, 1167 (7th Cir.1991); United States v. Cortez, 935 F.2d 135, 142 (8th Cir.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 945, 117 L.Ed.2d 114 (1992); United States v. Shaibu, 920 F.2d 1423, 1425 (9th Cir.1990) ("clearly erroneous" standard applied except when "case calls for the formulation of a general rule"); United States v. Evans, 937 F.2d 1534, 1538 (10th Cir.1991); United States v. Valdez, 931 F.2d 1448, 1451 (11th Cir.1991).
[4] See note 5, infra.
[5] We do not decide whether consideration of the objective setting in which the police-citizen encounter takes place should include individuating characteristicssuch as youththat are known or apparent to the officer and which he may be assumed to know render the individual more susceptible to coercion than the hypothetical reasonable person. Cf. State v. Carrillo, 156 Ariz. 125, 137, 750 P.2d 883, 895 (1988) ("the propriety of the investigative and interrogation techniques used must be judged in light of what the police knew or should have known about defendant's ability to comprehend the events and circumstances surrounding him or her"). The record provides no support for an argument that Detective Zattau should have recognized appellant as specially vulnerable to expressions of police authority by reason of his age; indeed, Zattau was never questioned about the impression of maturity (or immaturity) appellant made upon him or even whether he recognized him to be a juvenile rather than a young adult.
[6] Moreover, as in Bostick, supra, the fact that J.M.'s "movements were `confined' in [the] sense" that he was aboard a bus scheduled to depart shortly "was the natural result of his decision to take the bus; it says nothing about whether or not the police conduct at issue was coercive." ___ U.S. at ___, 111 S.Ct. at 2387.
[7] See McNeil v. Wisconsin, ___ U.S. ___, ___, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991) ("suspects often believe that they can avoid the laying of charges by demonstrating an assurance of innocence through frank and unassisted answers to questions").
[8] And this could remain true even though a youngster believing the police intend to search him without consent might wonder why they bothered to request it.
[9] The trial judge stated that "the law is clear" that the detective was "not obliged, in fact, to undercut his effort by saying, oh, you don't have to answer any questions, you can walk away from me immediately, you can in fact ignore me and indeed, I would advise you to do that." But particularly in the context of juvenile consents, the Supreme Court's recognition that advice of the right to refuse, though never decisive by itself, may be "highly relevant" to the voluntariness of consent, Mendenhall, supra, lends importance to this factor which the trial judge's statement may not adequately reflect.
[1] Although a juvenile was involved in California v. Hodari D., ___ U.S. ___, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (holding that the respondent not seized until he was tackled by police officer who was chasing him), the issue was not presented.
[2] In Chesternut the Court refers to the "reasonable man" standard in one sentence and to the "reasonable person" standard in the sentence that immediately follows. Moreover, the Court had no difficulty rejecting the magistrate's assessment of the factual context and concluding for itself that the pursuit of Chesternut by the police was not a seizure. Id. at 575, 108 S.Ct. at 1980.
[3] See Metropolitan Police Department General Order, Series 305, No. 1 (Dec. 10, 1990) (principal factors to be considered by police officers in dealing with juveniles are age, attitude, prior involvements, nature of the offense, and the seriousness of the complaint).
[4] Indeed, the trial judge explicitly stated his impression that Detective Zattau was "obviously a well-trained and experienced detective. He, I'm sure, has been trained in what things to avoid and what conduct to avoid in order to ensure that he does not get himself into a situation where he is overbearing on someone."
[5] The majority opinion does not foreclose such an approach, but rather concludes that in the absence of an evidentiary record, through testimony brought out by J.M., the trial judge was not required to address J.M.'s age in determining whether he was seized. See majority opinion at 501 n. 5. While I agree that an evidentiary record as the majority describes could possibly strengthen J.M.'s position, the trial judge was not required to close his eyes to the physical appearance of J.M. in deciding whether or not the police officer should have been aware that he was confronting a child. Defense counsel argued that age was a significant factor that the judge should consider, and the trial judge gave no reason for not doing so.
[1] See United States v. Clutter, 914 F.2d 775 (6th Cir.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1413, 113 L.Ed.2d 466 (1991); Davis v. United States, 327 F.2d 301 (9th Cir.1964); Murphy v. State, 355 So.2d 1153 (Ala.Crim.App.1978); Doyle v. State, 633 P.2d 306 (Alaska Ct.App. 1981); In re Robert H., 78 Cal.App.3d 894, 144 Cal.Rptr. 565 (1978); State v. McBride, 261 Ga. 60, 401 S.E.2d 484 (1991); Rajappa v. State, 200 Ga.App. 372, 408 S.E.2d 163 (Ga.Ct.App.1991); People v. Holmes, 180 Ill.App.3d 870, 129 Ill.Dec. 955, 536 N.E.2d 1005 (Ill.App.Ct.1989); People v. Swansey, 62 Ill.App.3d 1015, 20 Ill.Dec. 211, 379 N.E.2d 1279 (1978); State v. Folkens, 281 N.W.2d 1 (Iowa 1979); People v. Oates, 104 A.D.2d 907, 480 N.Y.S.2d 518 (1984); State v. Scott, 82 Or.App. 645, 729 P.2d 585 (1986); In re Jermaine, 399 Pa.Super. 503, 582 A.2d 1058 (Pa.Super.Ct.1990), State v. Jones, 22 Wash.App. 447, 591 P.2d 796 (1979).
[2] The maturity, sophistication, and street savvy of this youthful drug courier/entrepreneur were exemplified by his testimony during cross-examination at the suppression hearing that he knew that if he did not let the police officer check his bag, the officer might become suspicious and investigate him further. Moreover, he explained that he had no intention of stopping the officer from patting him down, "because if I would have tried to, he would have got more suspicious at me." [sic]
[3] It is significant that after the record was closed and oral argument had commenced, the judge, sua sponte and without objection, recalled the government's main witness to the witness stand to answer additional questions regarding the voluntariness of appellant's consent.
[1] See Florida v. Bostick, ___ U.S. ___, ___ n. 1, 111 S.Ct. 2382, 2390 n. 1, 115 L.Ed.2d 389 (1991). Justice Marshall, with whom Justice Blackmun and Justice Stevens join, dissenting:

It does not follow ... that the approach of passengers during a [bus] sweep is completely random. Indeed, at least one officer who routinely confronts interstate travelers candidly admitted that race is a factor influencing his decision whom to approach. See United States v. Williams, No. 1:89CR0135 (ND Ohio, June 13, 1989), p. 3 ("Detective Zaller testified that the factors initiating the focus upon the three young black males in this case included: (1) that they were young and black...."), aff'd, No. 89-4083 [916 F.2d 714] (CA6, Oct. 19, 1990), p. 7 (the officers "knew that the couriers, more often than not, were young black males"), vacated and remanded, 500 U.S. ___, 111 S.Ct. 1572 [114 L.Ed.2d 74] (1991). Thus, the basis of the decision to single out particular passengers during a suspicionless sweep is less likely to be inarticulable than unspeakable.
[2] See Judge Farrell's opinion at p. 499.
[3] See generally United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
[4] See Michigan v. Chesternut, 486 U.S. 567, 574, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988).
[5] See Schneckloth, supra, 412 U.S. at 229, 93 S.Ct. at 2048.
[6] See United States v. Joseph, 282 U.S.App.D.C. 102, 105, 892 F.2d 118, 121 (1989).
[7] According to the bus manifest, twenty-nine other passengers remained seated during the scheduled ten minute rest stop in Washington (the last stop having been made in Philadelphia). The officers boarded the bus immediately as the bus driver alighted, announced their identity and purpose over the intercom, and stationed themselves in the narrow aisle. One officer displayed his gun.
[8] See Mendenhall, supra, 446 U.S. at 551, 100 S.Ct. at 1875; Guadalupe v. United States, 585 A.2d 1348 (D.C.1991).
[9] Detective Zattau testified that he did not have consent-to-search forms with him that night and was unaware of the existence of such forms (other than for consent to search premises).
[10] The trial judge recalled the detective to the stand to describe his training and method of operation. For a comprehensive description of the history and modus operandi of the interdiction squad, see United States v. Maragh, 756 F.Supp. 18 (D.D.C.1991). See generally Sandra Guerra, Drug Interdiction Operations: Finding the Balance, 82 J.CRIM.L. & CRIMINOLOGY 1109 (1992).
[11] Detective Zattau's testimony as to body movements was consistent with J.M.'s testimony. According to J.M., he "turned his body" in a slanted way and "raised his hands."
[12] In rejecting J.M.'s argument as to seizure, the court relied on the fact that the detective's testimony on recall showed that he had followed interdiction procedures (Zattau was not overbearing, spoke in conversational tones, did not display a weapon, etc.). The court remarked that the detective was not required to undercut his efforts by advising J.M. of his right to refuse to answer questions and refuse consent to the search.
[13] See Cherry v. State, 86 Md.App. 234, 586 A.2d 70, 72-73 (1991) (citations omitted):

We are now asked to review the constitutionality of the search. In so doing, we extend great deference to the fact-finding of the suppression hearing judge with respect to determining the credibility of the witnesses and to weighing and determining first level facts.... But as to the ultimate conclusionary fact of whether appellant's consent was truly voluntary, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of this case.
[14] In re J.M., 596 A.2d 961 (D.C.1991), vacated, February 5, 1992.
[15] See, e.g., State v. Zapp, 108 Idaho, 701 P.2d 671 (App.1985) (shoulder shrug did not constitute consent to search paper bag in appellant's hand); Rosell v. State, 433 So.2d 1260 (Fla.App. 1983) (non-English speaking appellants merely acquiesced to uniformed officers who, using gestures, directed appellants to open camper top of truck).
[16] In our country's cities, during the year 1989, 46% of the persons arrested for drug violations were black, despite the fact that blacks constitute 12% of the nation's population. During the same period, in our cities, arrests of black persons under 18 years of age constituted 51.5% of the total. Federal Bureau of Investigation, U.S. Dep't of Justice, CRIME IN THE UNITED STATES 1989 (1990). The statistics do not show how many of the arrests resulted in prosecutions or convictions.
[17] The United States Court for the Eighth Circuit recently met head-on the issue of race in drug interdiction. See United States v. Weaver, 966 F.2d 391, 392 (8th Cir.1992). Chief Judge Arnold (dissenting from the majority's affirmance of the trial court's denial of a motion to suppress) after alluding to an agent's description as a "roughly dressed black male" (reported in the majority opinion) observed:

Use of race as a factor simply reinforces the kind of stereotyping that lies behind drug-courier profiles. When public officials begin to regard large groups of citizens as presumptively criminal, this country is in a perilous situation indeed.
The majority countered:
We agree with the dissent that large groups of our citizens should not be regarded by law enforcement officers as presumptively criminal based upon their race. We would not hesitate to hold that a solely race-based suspicion of drug courier status would not pass constitutional muster.
Id. at 394 n. 2.
After alluding to the agent's testimony about the Crips and the Bloods in Los Angeles, and notorious interstate travel, the majority concluded that race, when coupled with other facts could be a factor in the agent's decision to approach and detain. Id.
[18] In his farewell speech to the House of Representatives on January 9, 1901, Congressman George H. White (1852-1918) noted:

I would not thus digress from the question of issue and detain the House in [this] discussion... but for the constant and the persistent efforts of certain gentlemen upon this floor to mold and rivet public sentiment against us as a people and to lose no opportunity to hold up the unfortunate few who commit crimes ... as other races do, as fair specimens of representatives of the entire colored race.
George H. White, "Defense of the Negro Race," reprinted in THE NEGRO CARAVAN (Sterling A. Brown, et al. eds. 1941).
[19] Putting aside the status of race, I note that commentators have suggested that a reasonable person who would feel free to walk away is a legal fiction. See Shawn V. Lewis, Note, Fourth Amendment Protection Against Reasonable Seizures of the Person: The Intrusiveness of Dragnet Styled Drug Sweeps, 82 J.CRIM.L. & CRIMINOLOGY 797 (1992); see also Thomas K. Clancey, The Future of Fourth Amendment Seizure Analysis After Hodari D. and Bostick, 28 AM.CRIM.L.REV. 799 (1991).

Chief Judge Arnold, dissenting in United States v. Weaver, supra note 17, aptly observed:
It would be interesting to know how many innocent people have been stopped, either for questioning alone, or for the search of their luggage. This information, which we never seem to get in these cases, would go far towards enabling us to say whether the kind of police tactic we have before us is reasonable, which is, after all, the controlling criterion in applying the Fourth Amendment.