**Yera Y. BASNUEVA, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 02–CF–875.

District of Columbia Court of Appeals.

Submitted Oct. 1, 2003.

Decided May 12, 2005.

Ian A. Williams, appointed by the court, was on the brief, Washington, for appellant.

Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., Michelle D. Jackson, and Mary R. Pipitone, Assistant United States Attorneys, were on the brief for appellee.

Before TERRY, REID, and WASHINGTON, Associate Judges.

TERRY, Associate Judge.

Appellant was charged with one count of possession of cocaine with intent to distribute it and one count of possession of marijuana. After the trial court denied his motion to suppress evidence, he entered a conditional plea of guilty, see Super. Ct. Crim. R. 11(a)(2), to the cocaine count; the marijuana count was dismissed pursuant to a plea bargain. On appeal, appellant contends that the trial court erred in denying his motion to suppress. We affirm.

I

A. *The Government's Evidence*

On June 25, 2001, at 4:47 p.m., Officer Jerry Marshall of the United States Park Police was in an unmarked police car on Allison Street, N.W., which had stopped for a red light at the corner of Fifth Street. As he sat in his car waiting for the light to change, Officer Marshall saw a car with Virginia license plates headed north on Fifth Street. When he noticed that neither the passenger nor the driver of this car was wearing a seat belt, Officer Marshall turned on the emergency lights of his own car and "conducted a traffic stop." After the other car came to a halt, Officer Marshall[1] approached the driver's side while his partner, Officer Lagadinos, approached the passenger's side. Marshall asked the driver, Reginald Perry, for his license and registration. Perry gave Officer Marshall a non-driver's identification card and a Virginia registration in the name of Emmanuel Slatter. In response to further questions about the registration of the car, Perry told the officer that he did not have a license to drive, and that he was simply "taking the car for a test drive" with the owner, who he said was the man seated next to him in the front passenger seat. That man was appellant. Officer Marshall then asked appellant if he had a driver's license and inquired about the identity of Slatter. Appellant replied that he did not have a driver's license and that Slatter was his cousin who lived in Virginia.

Officer Marshall then asked Perry to get out of the car, arrested him for driving without a license,[2] and conducted a search of his person incident to the arrest. At that point Officer Lagadinos took custody of Perry, and Marshall went around to the other side of the car to question appellant. Officer Daniel Berberich, who had also arrived in response to Marshall's call for backup assistance,[3] stood next to Officer

1. Although Officer Marshall was not in uniform, he was wearing a jacket that said "Police" on the front and "Park Police" on the back. Underneath the jacket he wore a bulletproof vest with his badge fastened to the front. His gun remained in its holster throughout the traffic stop.

2. He also charged Perry with failure to wear a seat belt.

3. It is not clear from the record exactly when Officer Berberich arrived, but it is apparent that he was present and was questioning appellant before Perry's arrest. Thereafter Officer Berberich was standing at Officer Marshall's side while Marshall questioned appellant. Berberich was in full uniform and was driving a marked police car.

Marshall.[4]

Speaking to appellant through the open car window, Officer Marshall asked if he had any weapons, such as guns or knives. Appellant looked directly at Officer Marshall and said he did not. Marshall then asked appellant if he had any narcotics on him, specifically crack cocaine or marijuana. Appellant again said he did not, but this time he "broke eye contact with [Officer Marshall] and looked down towards his lap" as he "mumbled" his response. The officer then asked if he could search appellant,[5] and appellant replied, "Yeah, go ahead."[6] By this time three or four minutes had elapsed since the initial stop.[7]

After Officer Marshall received consent for the search, appellant got out of the car.[8] The officer asked him to turn and face the car, which he did. As he turned, Officer Marshall spotted a lump in appellant's groin area. With appellant facing the car, Marshall conducted an immediate patdown of his waistband area for weapons. At the officer's request, appellant then turned around, and Officer Marshall searched his pockets and groin area. When he felt a "hard rock-like substance" in the groin area where he had seen the lump, Officer Marshall unfastened appellant's belt and "drew back" his pants. Immediately he saw what appeared to be crack cocaine in the area where the lump had been. The officer placed appellant under arrest and then retrieved the crack cocaine by vigorously shaking appellant's right pant leg until it fell out from the bottom. At no time did appellant ever ask the officer to stop the search, even after his pants were pulled back and shaken in order to dislodge the cocaine.

### B.  The Defense Evidence

Appellant testified and gave a different account of what happened. According to appellant, when the car was initially pulled over, Officer Marshall first told both occupants to remain inside the car. Appellant's testimony about the events leading up to Perry's arrest was generally similar to that of the officer, but he stated that Officers Lagadinos and Berberich arrived together in another police car a few minutes after Officer Marshall made the initial stop.

Appellant said that no one asked for his permission to be searched; Officer Marshall just began to search him. He was soon joined by Officer Berberich while Officer Lagadinos examined the car. After Officer Lagadinos finished searching the car, he put on rubber gloves and searched appellant's genital area. However, despite the invasive search and the use of rubber gloves, appellant admitted that he never raised any protest even though he knew that an officer needed "consent to search."[9] He also acknowledged that

---

4.  Officer Marshall was not aware of any communication between Officer Berberich and appellant prior to his own questioning of appellant. Neither officer ever told appellant why Perry was being arrested, but appellant was close enough to overhear what the officers said to Perry.

5.  It is not clear from Officer Marshall's testimony what his exact words were in asking for permission to search, nor is it clear if he told appellant just what he was searching for.

6.  The officer did not inform appellant that he could refuse to give consent.

7.  At all times during the traffic stop and subsequent search, Officer Marshall spoke in an even tone and never raised his voice.

8.  The officer was not sure whether he or appellant opened the car door.

9.  Appellant stated, "I know that the police [are] supposed to ask you, can we search your, you know, your possession, can we search you."

none of the officers made any threats to him at any time.

### C. The Government's Rebuttal

Officer Berberich, called as a rebuttal witness, testified that he arrived at the scene of the traffic stop just as Officers Marshall and Lagadinos were escorting Perry out of the driver's side of the car. Berberich approached car from the passenger side and spoke with appellant through the open window. He asked appellant if he had any weapons, alcohol, or narcotics on him or in the car. To each question, appellant answered that he did not have any of these items.

Officer Marshall then came around to the passenger side of the car. Marshall, unaware that Officer Berberich had been questioning appellant, asked him essentially the same questions and received the same answers. Officer Marshall then asked appellant if it would "be all right if I search you." [10] Appellant replied, "Yes, go ahead." Marshall then asked appellant to get out of the car; appellant did so and was searched. After Officer Marshall felt the bulge in appellant's groin area, appellant was placed under arrest. Officer Berberich saw the crack cocaine when Officer Marshall loosened appellant's pants. The cocaine was then seized after it fell from the bottom of his pant leg.

### D. The Ruling of the Court

The court ruled that the traffic stop was valid and that appellant gave Officer Marshall a "voluntary ... knowing, and an intelligent consent" to be searched: "I think, 'go ahead' is very clear consent.'" The court based its conclusion on Officer Berberich's testimony [11] after finding that Officer Marshall's testimony was not clear about what specifically was said concerning consent [12] and that appellant's testimony was not credible.

In particular, the court ruled that the circumstances of the consent were not "coercive at all. I don't even think [appellant] indicated they were coercive, quite frankly.... I don't find anything coercive about it." The court pointed out that the officers did not draw their weapons, did not speak in a loud voice or yell, and did not use force to remove appellant from the car, and that appellant complied with all requests after he got out of the car. Even though the driver had just been arrested, in close proximity to appellant, the court did not "see anything that shows that there [was] any coercion or over display [*sic*—overt?] of authority here."

## II

### A. The traffic stop and the seizure

"[W]hen a traffic offense is committed in the presence of a police officer, a stop of the vehicle is generally lawful." *Minnick v. United States*, 607 A.2d 519, 524 (D.C.1992). Motorists are deemed to be "seized" within the meaning of the Fourth Amendment in a typical traffic stop because of the temporary detention of the driver and any passengers. *Whren v. United States*, 517 U.S. 806, 809–810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). A traffic stop must therefore be reasonable under the circumstances in order to be constitutional. "As a general matter, the decision to stop an automobile is reason-

---

**10.** Officer Berberich later testified that Officer Marshall's exact words were "Do you mind if I search you?"

**11.** "I credit the officer [Berberich] who said the defendant said, 'Yeah, go ahead.'"

**12.** "I'm sure he said something, but he doesn't remember what."

able where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810, 116 S.Ct. 1769; *see United States v. Mitchell,* 293 U.S.App. D.C. 24, 28, 951 F.2d 1291, 1295 (1991) ("The Fourth Amendment does not bar the police from stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if the offense is a minor one"); *cf. Atwater v. City of Lago Vista,* 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (when motorist was arrested, handcuffed, and briefly jailed for failing to wear a seat belt and for failing to fasten her child's seat belt, the seizure was not unreasonable).

■ In this case, it is not disputed that Officer Marshall saw Perry and appellant riding in a moving vehicle without their seat belts fastened. This was a violation of D.C.Code § 50–1802(a) (2001),[13] which authorizes a police officer to conduct a traffic stop, regardless of whether or not the officer ultimately cites the driver for this violation. *Mitchell,* 293 U.S.App.D.C. at 28, 951 F.2d at 1295; *see United States v. Montgomery,* 182 U.S.App.D.C. 426, 431, 561 F.2d 875, 880 (1977) ("Even a relatively minor offense that would not of itself lead to an arrest can provide a basis for a stop for questioning and inspection of the driver's permit and registration.") The trial court committed no error in ruling that Perry's and appellant's failure to wear seat belts authorized Officer Marshall to stop the car and issue a civil citation to the driver.

Appellant argues, however, that the court erred because he was in custody at the time he gave consent to be searched and that the coercive factor of "custody" was not taken into consideration in deter-

mining the voluntariness of his consent. The Supreme Court's decision in *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), forecloses this argument. In *Berkemer* the Court examined "whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered 'custodial interrogation'" within the meaning of that term as used in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See Berkemer,* 468 U.S. at 435, 104 S.Ct. 3138. The Court concluded that although the motorists were indeed "seized" during the roadside questioning, the situation was far more analogous to a *Terry* stop [14] than a custodial interrogation because of the "noncoercive aspect," *id.* at 440, 104 S.Ct. 3138 of an ordinary traffic stop. Therefore, the Court held "that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda.*" *Id.* Custody attaches only when the stop can be "characterized as the functional equivalent of formal arrest." *Id.* at 442, 86 S.Ct. 1602; *see Mitchell v. United States,* 746 A.2d 877, 891 (D.C.2000). *Berkemer* involved a single police officer, in view of passing motorists, asking the driver "a modest number" of questions and requesting him "to perform a simple balancing test." *Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138. The Court declared that "[t]reatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest" which would require the officer to give the driver *Miranda* warnings. *Id.*

In the case at bar, the traffic stop and the questioning took place on a public street during daylight hours. Only a few questions were asked, and they were not

---

**13.** With an exception not relevant here, section 50–1802(a) requires "the driver and all passengers in a motor vehicle" to wear a "properly adjusted and fastened" seat belt.

**14.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

369

particularly unusual. The only aspect of the stop that might suggest something beyond the typical traffic-stop seizure was the arrest of Perry for driving without a license, while appellant watched. However, Perry was peaceably arrested as soon as the officer determined that he did not have a driver's license. There was no reason for appellant to think that he might be arrested for a similar offense, since he had not been driving the car at all. Furthermore, throughout the questioning, and specifically at the time Officer Marshall asked for appellant's consent to search, appellant was sitting unrestrained inside the car on a public street. He had been stopped for no longer than five minutes. Neither he nor Perry had been verbally threatened at any time, nor had any of the officers displayed a weapon. There was nothing to suggest that appellant would be arrested.[15] We hold, therefore, that at the time appellant consented to be searched, he had only been temporarily seized in the course of a valid traffic stop and was not in custody.

B. *Appellant's consent to be searched*

■■■ A search conducted without a warrant is "per se unreasonable" under the Fourth Amendment unless it falls within a few specific and well-established exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Burton v. United States*, 657 A.2d 741, 745 (D.C.1994). One such exception is a search conducted with the consent of the person being searched. *Schneckloth*, 412 U.S. at 219, 93 S.Ct. 2041; *Burton*, 657 A.2d at 745. To justify a search under the consent exception, the

government must prove by a preponderance of the evidence that consent was, in fact, freely and voluntarily given. *Schneckloth*, 412 U.S. at 222, 93 S.Ct. 2041; *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Oliver v. United States*, 618 A.2d 705, 709 (D.C.1993). "A finding of voluntariness is essentially factual"; therefore, appellate review of such a finding is limited. *Oliver*, 618 A.2d at 709. This court is "bound to uphold the trial court's finding that a search was consensual unless such a finding is clearly erroneous." *Kelly v. United States*, 580 A.2d 1282, 1288 (D.C.1990).

■■■ "[T]he voluntariness of a consent to search is 'a question of fact to be determined from all the circumstances.'" *In re J.M.*, 619 A.2d 497, 500 (D.C.1992) (en banc) (quoting *Schneckloth*, 412 U.S. at 248–249, 93 S.Ct. 2041). The test is subjective, focusing specifically on the consenting person's characteristics and subjective understanding and on whether consent was "freely given."[16] *Burton*, 657 A.2d at 745; *see Jackson v. United States*, 805 A.2d 979, 985 (D.C.2002). The court can take into consideration "the youth of the accused ... his lack of education ... or his low intelligence ...." *Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041 (citations omitted). Additional factors include the length of the detention prior to consent, repeated and prolonged questioning, and physical punishment. *Id.* "[A]ccount must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Id.* at 229, 93 S.Ct. 2041. In situations where a juvenile has purported-

**15.** Appellant admitted in his testimony that he had drugs in his possession at the time of the traffic stop, but the officers did not know this at the time he was asked to consent to a search.

**16.** "Whether the suspect acts in his own best interest is not relevant to the determination of voluntary consent," and consent "may be freely given" despite an officer's failure to advise the suspect of his right to withhold consent. *Oliver*, 618 A.2d at 709.

ly consented to a search, the trial court must "expressly and thoroughly" deal with "the significance of age," *In re J.M.*, 619 A.2d at 504, although its findings on that issue "need not be in writing." *Id.* at 503.

Appellant argues that the trial court failed to consider his age and lack of maturity in determining his ability to give a voluntary consent. He bases his argument on this court's en banc decision in *In re J.M.*, in which a fourteen-year-old juvenile consented to an officer's request to search him. The issue that "troubled" the court was the lack of any specific findings concerning how the juvenile's age and relative lack of maturity affected his ability to consent voluntarily to a search. *In re J.M.*, 619 A.2d at 502. Consequently, the court remanded the case so that the trial court could make explicit findings on this issue. *Id.* at 502–504.

■ In the case at bar, appellant testified at the suppression hearing, and the court was able to assess his age, intellect, and maturity in rendering its decision. The court was fully aware that appellant was nineteen years of age (not fourteen, like the appellant in *In re J.M.*)—in other words, he was legally an adult—and had a GED high school diploma. The difference between nineteen and fourteen years of age is most significant. It distorts the holding in *In re J.M.* to suggest that the procedural safeguards intended to protect juveniles would apply to a person who has reached adulthood.[17] Furthermore, appellant testified that he knew the police were supposed to ask for consent before searching him, and that he had had prior contact with police officers. This level of sophistication persuades us that there was no need for the trial court to consider appellant's age expressly in finding voluntariness.

There is nothing in the record to suggest that coercion, fear, or intimidation was used to obtain appellant's consent to the search. Although there were three officers present, rather than just one as in *Berkemer*, the traffic stop still took place during the day and on a public street. The officers never drew their weapons or spoke in a loud voice, and appellant was not dragged from the car. Despite the arrest of the driver in appellant's presence and the modest number of questions asked of appellant by two officers, the court could—and did—reasonably conclude that it did not "see anything that shows there is any coercion or over display of authority here." Furthermore, the court found appellant's telling the officer to "go ahead" with the search to be "very clear consent." Appellant has not shown that the trial court's finding of voluntariness was "plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (2001).

The judgment of conviction is therefore

*Affirmed.*

---

**17.** The court in *In re J.M.* was concerned about whether the fourteen-year-old was mature enough to give consent. The court did not hold that anyone fourteen years of age is unable to give consent because he is not mature; rather, it concluded that this was a question for the trial to consider in the first instance. We do not read the decision in *In re J.M.* as requiring express findings on "the significance of age" when the consenting person has reached the age of majority. Circumstances may vary in particular cases, of course, but we are satisfied that *J.M.* does not automatically require such findings in all cases if the consenting person—like this appellant—is no longer a juvenile, to whom the law gives special protection.