*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-128

LORENZO D. HENDERSON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-7704-17)

(Hon. Robert A. Salerno, Trial Judge)

(Argued September 22, 2020                    Decided June 16, 2022)

*Anne Keith Walton* for appellant.

*Ann M. Carroll*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Angela Buckner*, and *Ariel Dean*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and MCLEESE, *Associate Judges*, and FISHER, *Senior Judge*.

GLICKMAN, *Associate Judge*: Appellant Lorenzo Henderson challenges the

trial court's denial of his Fourth Amendment motion to suppress a loaded firearm,

which police officers discovered under the hood of his car, and other evidence

derivative of that discovery. After an evidentiary hearing on the motion, the court found that appellant voluntarily consented to let the police look under his car's hood, and that the police did not exceed the scope of his consent in doing so. We affirm the court's rulings and appellant's resulting conviction for carrying a pistol without a license.

## I.

At the motions hearing, Metropolitan Police Officer Amanda Viteretti and appellant each testified regarding the circumstances in which the police recovered the firearm from appellant's car. Appellant's encounter with the police also was recorded on Officer Viteretti's and a second officer's body-worn camera footage, which was admitted in evidence. Except as otherwise indicated, the following facts are undisputed.

Shortly before 1:00 a.m. on the morning of April 30, 2017, gunshots were heard in the Lincoln Heights neighborhood of northeast Washington, D.C. Someone called 911 and reported that the shooter, described as a black man with braids or dreads and wearing dark-colored jeans, had hidden a gun in the engine compartment of an older white Jaguar with a long hood and driven toward Division and Nannie Helen Burroughs Avenues. Responding to the area, three uniformed Metropolitan

Police officers — Officers Viteretti, Lazarus, and Julien — located a white Jaguar matching the caller's description parked on Cloud Place, N.E. The vehicle was unoccupied. The officers stopped and got out of their marked police cars to investigate.

Moments later, while the officers were standing around the Jaguar, a man matching the 911 caller's description of the shooter walked up to Officer Julien from behind and started speaking to him. This man, whom Officer Viteretti later identified as appellant, stated he owned the Jaguar and had just parked it there in order to go see if his family was all right. Officer Julien asked, "this is your car?" and appellant again said it was and that he was checking on his family. Officer Julien replied, "okay, buddy," and then asked in a conversational tone, "can you pop the hood for us?" Appellant responded, "pop the hood?" Officer Julien said "yeah." Appellant then walked between Officer Julien and Officer Viteretti, opened the driver's side door, reached down, and pulled a latch to unlock the hood.

After thus "popping the hood," appellant turned and without a word began walking past Officer Julien and back in the direction from which he had come. Neither Officer Julien nor Officer Viteretti tried to stop appellant from leaving until Officer Lazarus noticed his departure and asked Officer Julien to "hang on to him."

Appellant then started running, and though Officers Julien and Viteretti pursued him, they were not able to catch him and he escaped. (The police arrested appellant a few days later.)

Meanwhile, Officer Lazarus remained with the Jaguar. As appellant was walking away, and just before the other officers started to pursue him, Officer Lazarus manually lifted the car's hood (which had not risen automatically when appellant unlatched it). Shining his flashlight into the engine compartment, Officer Lazarus almost immediately saw the handgun that had been placed there.

Appellant testified at the motions hearing that, before his encounter with the police at his Jaguar, he had been at a large gathering in Lincoln Heights to celebrate the anniversary of a friend's death. Appellant said he had consumed alcohol and marijuana and had become "high and drunk." The gathering was interrupted by a shooting, which appellant said he witnessed. Everyone fled, and appellant became separated from his family members. Appellant was "scared" because of the shooting, but after a while, he returned to the vicinity with his girlfriend to look for his cousins. There was, appellant said, "a high police presence" in the area, evidenced by a helicopter hovering over the scene, police vehicles, and the presence of police dogs, and he felt "a lot of tension in the air." Appellant testified that he, as

a black man, has an "automatic, built-in fear" of the police because of "the way officers handle black men." He said he personally had seen officers "put guns to [a] friend's head" and "beat" another person on the street. As a result of his fear of police, appellant said, he "normally do[es] what [police officers] demand [him] to do."

Upon returning to the scene, appellant came upon the three police officers standing around his car. The officers were looking at the Jaguar, not at him. Seeing them there, appellant said, made him even "more" scared than he already was on account of the shooting; he professed to view the situation as a very "dangerous" one. Nonetheless, appellant acknowledged, he walked up to the police officers on his own initiative. He testified that when one of the officers asked him to pop the hood, he took it as "a demand" and obeyed. He opened the driver's door of the car, which was not locked, reached in, and "pulled the latch." Appellant testified he knew that merely unlatching the hood would not cause the hood to rise by itself, and he did not intend for the police to look under the hood. He said he did not know why the police wanted him to pop the hood and that the request made no sense to him.

Appellant testified that after he unlatched the hood and got out of the car, he went to ask his girlfriend for the keys to the Jaguar, which she happened to be

holding. At that point, appellant said, he heard one officer tell another to apprehend him and then saw an officer make a "grab[] towards" him. Appellant "took off" running.

At the conclusion of the hearing, the court denied appellant's motion to suppress the evidentiary fruits of the search of the engine compartment of his car. Based, the court stated, on the totality of the circumstances, including both the characteristics of appellant, the entirety of the police conduct, and what was shown in the police body-worn camera footage, the court found that appellant voluntarily consented to the search by popping the hood in response to Officer Julien's request to do so. The court acknowledged appellant's testimony that he was "drunk and high at the time," his past unfavorable experiences with police, and "the societal context, which could lead young black men to fear contacts with the police." But two factors in particular "st[ood] out for the [c]ourt." First, the officers' conduct was not coercive; as the court stated, this was "not an intimidation or duress situation." The officers did not stop appellant and "never detained" or even touched him. Rather, it was appellant himself who initiated the encounter by walking up to the police and volunteering that the Jaguar was his.

Second, the court found the evidence clearly showed that appellant voluntarily and knowingly consented to the search. "The police asked him to pop the hood" and the court found he did so "willingly" and "without any hesitation." There was no badgering, the court emphasized, just "a single question asked; . . . a rather straightforward question and a rather straightforward response." Officer Julien's conversational "tone" and "inflection" confirmed that he was asking appellant a question and making a request, not issuing a command. The "police did not yell at him, they didn't raise their voice."

The court further found that the meaning of the request to "pop the hood" was unambiguous: "[t]he reason for asking to pop the hood is so that one could look under the hood," and "there can be no other purpose for popping the hood other than to open it." The court had no doubt appellant understood the police were asking him to unlatch the hood so that they could look inside the engine compartment; that was the "clear" and "common-sensical" reason, the court "didn't see or hear any confusion on [appellant's] part," and there was "nothing ambiguous" about his response.[1]

---

[1] The court found that appellant repeated the request to pop the hood "to confirm what the police [were] asking him to do, and he quickly and willingly [did] it."

Accordingly, the court ruled that appellant gave his consent for the police to lift the hood of his car and look into the engine compartment.  In addition, the court deemed the ensuing search to be within the scope of appellant's consent.  As the court noted, appellant did not "give the police consent to search the whole car," but only under the hood.  The police did not exceed the limited scope of appellant's consent; "under the hood is where they found the gun, quickly, by looking with the flashlight."  The gun was in "plain view" there.

Following the court's decision, appellant entered a conditional plea of guilty to the charge of carrying a pistol without a license, reserving his right to appeal the denial of his motion to suppress.

## II.

Appellant argues that he did not voluntarily consent to unlock the hood of his car, and that even if he did, the police exceeded the scope of his consent by lifting the hood and looking in the engine compartment.  We address each argument in turn.

**A.**

Under the Fourth Amendment, a warrantless search is "'per se unreasonable' . . . unless it falls within a few specific and well-established exceptions."[2] These exceptions include "a search conducted with the consent of the person being searched."[3] The key to justifying such a search is voluntariness. The government bears the burden of establishing that, considering the totality of the circumstances, "consent was in fact voluntarily given, and not the result of duress or coercion, express or implied."[4] The assessment of voluntariness must take into account whether police employed "subtly coercive" questioning to obtain the putative consent, "as well as the possibly vulnerable subjective state of the person who consents."[5]

---

[2] *Basnueva v. United States*, 874 A.2d 363, 369 (D.C. 2005) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

[3] *Id.* (citations omitted).

[4] *Schneckloth*, 412 U.S. at 227, 249; *accord Basnueva*, 874 A.2d at 369 (citations omitted).

[5] *Basnueva*, 874 A.2d at 369 (quoting *Schneckloth*, 412 U.S. at 229).

The trial court's determination that appellant consented voluntarily is a factual finding that we will affirm unless it is clearly erroneous.[6] Our deference to the trial court's factual determinations under this standard extends to that court's evaluation of the body-worn camera footage.[7] As the Supreme Court has explained, "[t]he rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility."[8] We also defer to trial judges because they are experienced fact finders and de novo review by an appellate court is unlikely to produce significantly more accurate factual determinations.[9] Additionally, permitting appellate courts "to share more actively in the fact-finding function would tend to undermine the legitimacy of [trial courts] in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority."[10]

---

[6] *Id.*

[7] *See*, *e.g.*, *Bost v. United States*, 178 A.3d 1156, 1197–99 (D.C. 2018) (reviewing trial court's interpretation of videotaped confession for clear error).

[8] *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

[9] *Id.* at 574–75.

[10] Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment.

With the "clearly erroneous" standard firmly in mind, we turn first to appellant's claim that several circumstances rendered his purported consent involuntary. Appellant points to the fact that it was a "post-shooting scene with a very high police presence"; that he, as a black man, had an "automatic, built-in fear" of the police; that he "had bad experiences with police officers in the past, including witnessing police violence"; and that he had been drinking and smoking marijuana shortly before he encountered the police.[11] The trial court considered these circumstances, but nonetheless found them offset by several factors indicating that appellant gave his consent voluntarily. We conclude that the court had a sufficient evidentiary basis for that determination.

First, it was appellant who initiated the encounter upon seeing the three police officers who had responded to the vicinity of a shooting at 1:00 in the morning on April 30, 2017. Appellant came forward alone to tell the officers that the Jaguar they were inspecting belonged to him. Whatever appellant's feelings about police, his actions in coming forward were not those of someone gripped by fear of police mistreatment or acting under duress. Rather, they bespoke a degree of assurance, comfort, and capability in confronting the officers.

---

[11] Brief for Appellant at 8-9.

Second, the officers did not behave toward appellant in a coercive or intimidating manner.[12]  Appellant was not seized and his freedom of movement was not curtailed.[13]  The officers never brandished their weapons and did not threaten appellant in any way.  Nor did the police badger appellant, subject him to hostile, prolonged, or subtle interrogation, or otherwise treat him like a suspect or take advantage of any perceived mental impairment.  Officer Julien spoke to appellant in a normal tone of voice.[14]  His sole question, "can you pop the hood for us," was polite and non-accusatory.  As phrased, it was a request, not a directive.  The record thus does not support appellant's claim that Officer Julien issued a command he realistically could not decline, and the trial court certainly did not clearly err in rejecting that claim.

---

[12]  *See Castellon v. United States*, 864 A.2d 141, 155 (D.C. 2004) ("The officer's conduct during the encounter is also important to the voluntariness analysis.").

[13]  *See United States v. Bearden*, 780 F.3d 887, 895 (8th Cir. 2015) (considering "whether the defendant was in custody or under arrest when consent was given") (internal citations omitted).

[14]  *See Burton v. United States*, 657 A.2d 741, 745 (D.C. 1994) (finding voluntary consent where officers asked "only a few brief questions" in a "conversational tone").

Third, in response to Officer Julien's question, appellant evinced no reluctance, hesitation, confusion, or misunderstanding. He promptly complied with the request by reaching into his car and releasing the latch. There is no indication or suggestion that he fumbled or had difficulty completing the task, or that he was too intoxicated to be able to give valid consent. A trier of fact could find that appellant's "ready acquiescence" in the absence of any intimidation, duress, or impairment undercuts the claim that his will was overborne.[15]

For these reasons, we hold the trial court did not clearly err in finding that appellant's cooperation with Officer Julien's request to pop the hood was voluntary.

**B.**

Appellant argues that any valid consent he gave was limited just to doing what he was asked to do, i.e., to pulling the hood latch, which merely served to unlock the car's hood, not to raise it so that the engine compartment could be viewed. Appellant claims that Officer Lazarus exceeded the limited scope of his putative consent by proceeding without express permission to manually lift up the hood and look inside

---

[15] *United States v. Moreno*, 701 F.3d 64, 77 (2d Cir. 2012).

the engine compartment. It is true that Officer Julien had not asked appellant for permission to look under the hood in so many words, and appellant had not explicitly said the police could do so.[16]

To determine the scope of consent, we apply a standard of objective reasonableness, asking "what would the typical reasonable person have understood by the exchange between the officer and the suspect?"[17] The objective nature of this standard appears to make it a question of law (once the material facts are established), as to which our review is de novo.[18]

---

[16] In the trial court, appellant did not specifically object that the police exceeded the scope of his consent. The government does not argue, however, that we should review the issue only for plain error. Since we perceive no error at all, the point is moot.

[17] *Brown v. United States*, 983 A.2d 1023, 1027 (D.C. 2009) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).

[18] There is a circuit split on the question of whether the scope of a given instance of consent is reviewed de novo or merely for clear error. *See United States v. Jones*, 523 F.3d 31, 38-39 (1st Cir. 2008). The Sixth, Eighth, Ninth and Tenth Circuits review the scope of consent for clear error. *United States v. Taylor*, 820 F. App'x 359, 362 (6th Cir. 2020); *United States v. Lopez-Cruz*, 730 F.3d 803, 809 (9th Cir. 2013); *United States v. Martel-Martines*, 988 F.2d 855, 858 (8th Cir. 1993); *United States v. Mains*, 33 F.3d 1222, 1227 (10th Cir. 1994). The Fifth Circuit and the Seventh Circuit review the scope of consent de novo and the underlying factual conclusions for clear error. *United States v. Gallegos-Espinal*, 970 F.3d 586, 591 (5th Cir. 2020); *United States v. Breit*, 429 F.3d 725, 730 (7th Cir. 2005). Our

The scope issue in the present case thus turns on what a typical reasonable person would have understood by (1) Officer Julien's request to "pop the hood for us," i.e., the police, and (2) appellant's response of pulling the hood latch and then walking away. Appellant claims that, being a car mechanic himself, he did not understand "pop the hood" to mean open the hood; rather, he claims he understood the phrase to mean nothing more than pull the hood latch until you hear the "pop." Thus, he argues, he consented to the mechanical operation he was asked to perform but not to opening the hood for the police. But because our inquiry is one of *objective* reasonableness, appellant's uncommunicated subjective understanding does not decide the question.[19] We agree with the trial court as to the only objectively reasonable interpretation of the exchange between Officer Julien and appellant. No reasonable person would imagine the police were simply conducting a field test on the operability of the Jaguar's hood latch. We believe the typical reasonable observer in appellant's position would understand that Officer Julien was asking him to open the hood so the police could look under it, and would understand appellant's cooperative and unqualified response as his full consent to do so for that

---

conclusion in the present case would not change if we were to apply the more deferential "clearly erroneous" test.

[19] *Ware v. United States*, 672 A.2d 557, 565 (D.C. 1996) (citing *Jimeno*, 500 U.S. at 252).

purpose – not merely his partial or limited consent to release the latch. Appellant proposes no other interpretation plausible under the circumstances of this case, and we see none.[20]

Therefore, when the hood of appellant's car did not rise by itself after appellant unlocked it, Officer Lazarus did not need appellant's additional express permission to manually lift the hood up. That permission was implicit in the consent

---

[20] The court in the most analogous case we have found reached essentially the same conclusion. In *United States v. Monden*, No. CR16-0051, 2016 U.S. Dist. LEXIS 99838 (N.D. Iowa July 29, 2016), *aff'd on other grounds sub nom. United States v. Mosley*, 878 F.3d 246 (8th Cir. 2017), police stopped a driver after a bank robbery. During the stop an officer asked the driver if she could "pop the trunk" of her car. *Id.* at *27. She responded to that request by pulling the trunk release lever inside the vehicle, allowing the police to open and look inside the trunk. *Id.* at *7, *26-*27. The court found that the driver, by her compliance with the officer's request, "impliedly" and "voluntarily" consented to the search of the trunk. *Id.*

In different contexts, other courts also have understood the phrase "pop the hood" to encompass opening or raising the hood, not just unlocking it. *See, e.g.*, *United States v. Stephens*, 365 F.3d 967, 972 (11th Cir. 2004) (describing how authorities placed a hidden camera inside a car facing outward, through the front windshield, but "the first thing [appellant's co-conspirator] did was *pop the hood* of his car so that the camera could not record anything that was going on" in front of the car (emphasis added)); *State v. Clay*, 248 So. 3d 665, 671 (La. Ct. App. 2018) ("He stated that he saw defendant open the door of the Honda, unhook the hood latch and *pop the hood*, then move to the front of the vehicle, and begin working under the hood." (emphasis added)); *Patterson v. State*, 496 S.W.3d 919, 926 (Tex. App. 2016) ("When they reached Patterson's home, Williams testified that he asked her to *pop the hood* and then retrieved a gun from under it." (emphasis added)).

appellant already had given when he responded to Officer Julien's request to "pop the hood" by pulling the latch to unlock it.[21] And having allowed the police to open the hood and look inside, appellant did not communicate any retraction of his consent merely by his silently walking away from the vehicle and going to his girlfriend to obtain the car keys from her. If anything, his silent acquiescence in the search of the engine compartment reinforces the conclusion that he had consented to it.

To be clear, and as the trial court recognized, consenting to "pop the hood" has its limits. An objective observer would reasonably understand it to allow the limited actions that Officer Lazarus took here, which were to manually lift the hood and, using his flashlight, observe what was in plain sight. That same consent, however, may not permit officers to conduct a much more intrusive search under the hood, such as by taking apart the engine, and it certainly would not permit the police to search the vehicle's passenger compartment or trunk.

---

[21] *Cf. Brown*, 983 A.2d at 1027 (holding that although the appellant "did not give explicit, verbal permission" to search inside a pill bottle, she "impliedly consented to the search by handing the bottle to [the officer] in response to a question about whether she had any 'guns, drugs, or narcotics'").

## III.

For the foregoing reasons, we affirm the denial of appellant's suppression motion and the judgment of the Superior Court.

*So ordered*.