*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CF-0960

TRAVANION WARD-MINOR, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018-CF2-014858)

(Hon. Michael O'Keefe, Trial Judge)

(Argued April 4, 2024                                    Decided June 6, 2024)

*Richard P. Goldberg* for appellant.

*David B. Goodhand*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *Stephanie Dinan*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY and SHANKER, *Associate Judges*, and FISHER, *Senior Judge*.

FISHER, *Senior Judge*: Appellant Travanion Ward-Minor challenges the denial of his motion to suppress evidence found on his person after he was handcuffed and frisked by an officer during a traffic stop. He argues that the trial court clearly erred in finding that the pat-down was a valid consent search and, therefore, permissible

under the Fourth Amendment. On the specific facts of this case, we agree and reverse Ward-Minor's convictions.

## I. Factual and Procedural Background

### A. Indictment and Conviction

After a loaded firearm was found on his person, Ward-Minor was charged with carrying a pistol without a license; possession of an unregistered firearm; and unlawful possession of ammunition, in violation of D.C. Code §§ 22-4504(a), 7-2502.01(a), and 7-2506.01(3), respectively. Ward-Minor filed a motion to suppress all tangible evidence obtained from the search. The trial court denied the motion after a hearing held October 17, 2022, and Ward-Minor entered a conditional plea of guilty to the indictment, preserving his right to appeal the denial of his suppression motion.[1]

---

[1] Ward-Minor failed to specify in writing which pre-trial ruling or rulings he wanted to appeal, as required by Super. Ct. Crim. R. 11(a)(2). However, the government acknowledges that the plea was conditional and that the plea colloquy clearly reserved Ward-Minor's right to appeal the suppression ruling. *See Casey v. United States*, 788 A.2d 155, 157-58 (D.C. 2002). While the parties dispute whether any other adverse pre-trial rulings were preserved for appellate review, we need not reach that question in light of our disposition of the suppression issue. *See infra* note 13.

## B. The Suppression Hearing

The evidence at the suppression hearing consisted of testimony from Lieutenant James Chatmon (who was a sergeant at the time of the traffic stop) and video footage from his body-worn camera ("BWC"). Chatmon testified that he and his partner, Lieutenant Modl, conducted a traffic stop involving Ward-Minor on October 8, 2018. At the time, Chatmon and Modl were both part of the Metropolitan Police Department's Gun Recovery Unit, which specialized in "weapon recovery or weapon interdiction." Lieutenant Modl, who was driving, initiated the stop after noticing that a car passing in the opposite direction had an "extremely dark" tint on its windows. Ward-Minor, a Black man who then was 21 years old, was seated in the front passenger seat of that vehicle.

The BWC footage shows that Chatmon approached the passenger side of the vehicle and instructed Ward-Minor to roll the window down, which he did. Ward-Minor sat silently with his hands on the dashboard while Modl spoke with the driver, until Chatmon said to Ward-Minor, "Do me a favor, open your door for me, bro." Ward-Minor unlatched the door handle and Chatmon pulled the door open the rest of the way. Chatmon then said, "Do me a favor, take a step—step out for me real quick[.]" Ward-Minor questioned why, as a passenger, he had to step out of the car, and said "I don't feel safe." Chatmon responded that the "Supreme Court says in a

traffic stop, everybody has to come out of the car, okay, if the officers ask."[2]

Seemingly speaking of Ward-Minor's reluctance to exit the car, Chatmon asked if the reason was "because you got something on you?" Ward-Minor admitted to having "weed";[3] Chatmon suggested that this was "no big deal" and then asked if there was "something else other than weed on you." Ward-Minor denied having anything else.

As Ward-Minor started to move in response to the command to exit, Chatmon stopped him and handcuffed him behind his back. Chatmon testified that he used the handcuffs because Ward-Minor was "extremely nervous" and had "moved his hands towards his waist area, which again alarmed me a little bit," and added that Ward-Minor had "mentioned that he had marijuana already, so I was concerned that he possibly could have a weapon." Chatmon also noted that "he was still moving around kind of antsy, which further aroused my suspicion." Holding onto Ward-Minor's arms, Chatmon directed him out of the car and told him to turn around. As Ward-Minor started to turn, Chatmon told him, among other things, *see infra* note 5, to "stop moving" and that he was "doing too much moving," and then asked, "Do

---

[2] *See Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (holding that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop" without violating the Fourth Amendment).

[3] Chatmon testified that he smelled marijuana as he approached the vehicle.

you have something on you, my man?" A brief exchange followed in which Chatmon repeated that Ward-Minor's movements made Chatmon think that Ward-Minor had "something" on him.

Just before patting Ward-Minor down, Chatmon said "I'm just going to check you real quick, okay, make sure you don't have nothing on you. That's cool? All right." Ward-Minor's head is not visible at this point in the BWC footage, but one of his dreadlocks is visible and appears to bob up and down while Chatmon is still speaking. On direct examination (after the video had been played), Chatmon testified that "I asked him, you know, could I pat him down, at which point I did." More detail was elicited on cross-examination, during which Chatmon agreed that he had said something like "I'm going to check you real quick if that's cool" and that Ward-Minor "nodded or affirmed."[4]

---

[4] The exact exchange between defense counsel and Chatmon occurred as follows:

> Q. And you said, I'm going to check you real quick if that's cool, or something like that?
>
> A. That's correct.
>
> Q. And he was in handcuffs at that time, right?
>
> A. He was.
>
> Q. And he nodded, right—or nodded or affirmed, right?

While it is difficult to make out the exact words, Ward-Minor can be heard on the BWC footage saying something to the effect that he knew he needed to spread his legs for the pat-down. Chatmon proceeded to pat down Ward-Minor's legs and crotch area and found a firearm concealed in his compression shorts.

## C. The Trial Judge's Findings

After the conclusion of evidence, the trial judge, Judge Michael O'Keefe, took a recess and reviewed the BWC footage again. He then denied the motion to suppress (as well as a separate motion to dismiss on equal-protection grounds) in oral rulings.

Judge O'Keefe first found that the initial stop of the vehicle was lawful based upon reasonable suspicion of a window tint violation, and that Chatmon was entitled to order Ward-Minor to step out of the car and to place him in handcuffs for officer safety. These findings are not disputed on appeal. While the government had argued that the search was justified by reasonable, articulable suspicion, Judge O'Keefe stated that the "officer probably had a hunch" that Ward-Minor had a gun but expressed doubt that Chatmon had "articulated a sufficient basis to search[.]"[5]

---

A. Correct.

[5] Judge O'Keefe observed that Chatmon appeared to give a series of confusing commands—e.g., "the officer was telling him to turn one way and then saying, well,

However, the judge did not expressly rule on that issue, explaining that there was no need to "even get to the reasonable articulable suspicion" and that he did not know how he "would have come out on that." The government has not pursued this theory on appeal (either as an alternative theory for affirmance or a basis for remand), and we, therefore, do not address it further.

Judge O'Keefe concluded that "the linchpin of this whole thing is whether or not there was consent freely given[.]" He found that Chatmon had said "I'm going to check you. Is that okay?" and characterized this as "a statement and a question together[.]" (Defense counsel had previously conceded, in a colloquy with the judge during closing argument, that Chatmon had said "Is that cool?" and that this was a question.) The judge commented that "even though you can't see Mr. Ward-Minor's head" in the BWC footage, he appeared to give an "affirmative response." While the transcript does not capture the moment with perfect clarity, we agree with the government that the judge himself likely nodded his head to replicate the movement he was finding to be Ward-Minor's non-verbal response.

Judge O'Keefe also indicated that he thought "there might even be a verbal response" because he "thought" he heard "'all right' or something like that,

_____

stop moving, like, stop moving, but move; move, but stop moving"—coupled with accusatory questions seemingly designed "to elicit some kind of incriminating statement to admit that he had something on him."

something verbal as well."[6]  In addition, the judge placed great weight upon two other factors: first, that Ward-Minor seemed to "help or assist in getting ready for the search" by acknowledging that he knew he needed to spread his legs and second, that he "wasn't shy about asserting" what he incorrectly "thought was his rights [sic] about not having to get out of the car."

Judge O'Keefe turned to the issue of voluntariness and recited the non-exhaustive list of factors we articulated in *Basnueva v. United States*, 874 A.2d 363, 369 (D.C. 2005).  He then largely repeated the facts that had led him to conclude that there had been consent, noting again that Ward-Minor "went a little bit further by setting himself up to be searched by the officer, which to me would indicate to sort of a voluntariness."  The judge added that he did not "know what was going through Mr. Ward-Minor's mind at the time" but that "[a]ll I know is that on the tape he consents verbally[7,] and it appears physically, and that he had the capacity and the intelligence to challenge the officer when he was first asked to step out of the vehicle, so it's not like he is a shrinking violet."  Thus, he found that Ward-Minor

---

[6] Given the tentativeness of this observation, we do not treat it as a conclusive factual finding that there was a verbal response.  Moreover, it is unsupported by the BWC footage or any testimony.  The words "all right" are audible but are in fact spoken by Chatmon.

[7] We are unsure how to reconcile this comment with the judge's earlier statement that there only "might" have been a verbal response.

had consented voluntarily.

Finally, Judge O'Keefe rejected Ward-Minor's argument that the pat-down exceeded the scope of consent, another issue that is not before us on appeal. Ward-Minor filed a timely notice of appeal.

## II. Discussion

### A. Legal Background

"A search conducted without a warrant is 'per se unreasonable' under the Fourth Amendment unless it falls within a few specific and well-established exceptions." *Basnueva*, 874 A.2d at 369 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "One such exception is a search conducted with the consent of the person being searched." *Id.* Where, as here, "the government contends the person agreed to a pat-down, it bears the burden to prove that 'consent was, in fact, freely and voluntarily given.'" *Dozier v. United States*, 220 A.3d 933, 940 (D.C. 2019) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper*, 391 U.S. at 548-49.

The burden is on the government "to prove, by a preponderance of the evidence, that [the individual] affirmatively consented to [the] search." *Hawkins v.*

*United States*, 248 A.3d 125, 131 (D.C. 2021). "Because the government often asserts that a defendant consented in cases 'where the police have some evidence of illicit activity, but lack probable cause to arrest or search,'" courts "carefully examine the government's claim that a defendant consented." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (quoting *Schneckloth*, 412 U.S. at 227).

The voluntariness of consent is a factual question to be judged under the totality of the circumstances. *Henderson v. United States*, 276 A.3d 484, 489 (D.C. 2022); *Basnueva*, 874 A.2d at 369. "The test is subjective, focusing specifically on the consenting person's characteristics and subjective understanding and on whether consent was freely given." *Basnueva*, 874 A.2d at 369 (quotation marks omitted). "'Whether the suspect acts in his own best interest is not relevant to the determination of voluntary consent,' and consent 'may be freely given' despite an officer's failure to advise the suspect of his right to withhold consent." *Id.* at 369 n.16 (quoting *Oliver v. United States*, 618 A.2d 705, 709 (D.C. 1993)).

Whether a person consented to a search, and did so voluntarily, are findings of fact that we review for clear error. *See Henderson*, 276 A.3d at 489; *Hawkins*, 248 A.3d at 129. Under the clearly erroneous standard, it is not enough to warrant reversal for a reviewing court to be "convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Dorsey v. United States*, 60

A.3d 1171, 1205 (D.C. 2013) (en banc) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985)).  However, while the "'clearly erroneous standard of review is highly constraining,' it does not relieve us of our obligation to conscientiously review the trial court's finding based on the record presented." *Hawkins*, 248 A.3d at 130 (quoting *Dorsey*, 60 A.3d at 1205).

When reviewing for clear error, "[o]ur deference to the trial court's factual determinations . . . extends to that court's evaluation of the body-worn camera footage."  *Henderson*, 276 A.3d at 489; *see also Hawkins*, 248 A.3d at 130 ("This standard of review applies even though we are able to watch the same video footage that [the trial judge] studied.").  However, we will find clear error when "we are 'on the entire evidence . . . left with the definite and firm conviction that a mistake has been committed.'"  *Hawkins*, 248 A.3d at 131 (omission in original) (quoting *Anderson*, 470 U.S. at 573).

## B. Review of the Trial Court's Factual Findings

The question before us is whether the trial court clearly erred in finding that Ward-Minor consented, freely and voluntarily, to the warrantless search of his person.  Judge O'Keefe found, among other things, that Chatmon asked for consent to search, that Ward-Minor consented with a nod, and that this consent was voluntary.  While the record supports the finding that Ward-Minor nodded, given

the circumstances and the timing of the nod, we respectfully conclude that the record does not support Judge O'Keefe's finding of voluntary consent.

Defense counsel's arguments before the trial court and Ward-Minor's opening brief on appeal focused principally on the coercive circumstances of the stop and their bearing on the question of voluntariness; as a result, the government suggests that we should consider only whether consent was given voluntarily without addressing whether consent was in fact given at all. We doubt that such bifurcation is possible when analyzing the totality of the circumstances. In any event, in this case the disputed issue is not whether there was any affirmative response, but rather the meaning of that response. The timing of the nod largely determines whether Ward-Minor was agreeing to a request to conduct a pat-down search or merely acquiescing to Chatmon's explanation of what he was about to do.

At the outset, we agree with Ward-Minor that his seizure and handcuffing are relevant factors that should be considered in evaluating his claim that he did not give voluntary consent. *See Oliver*, 618 A.2d at 709 ("The voluntariness of consent is determined by careful scrutiny of all circumstances surrounding the search.").[8] Such

---

[8] *See Henderson*, 276 A.3d at 490 (noting in support of a finding of voluntariness that the consenting person "was not seized and his freedom of movement was not curtailed"); *Kelly v. United States*, 580 A.2d 1282, 1289 (D.C. 1990) (noting that there "was no detention or physical coercion[ and] no show of force"); *United States v. Magallon*, 984 F.3d 1263, 1281-82 (8th Cir. 2021) (custody

factors are not, however, fatal to a claim of voluntariness. *See United States v. Watson*, 423 U.S. 411, 424 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."); *United States v. Lee*, 793 F.3d 680, 686 (6th Cir. 2015) ("[J]ust because a defendant is handcuffed when he or she gives consent does not make such consent invalid."). Rather, that Ward-Minor was seized, handcuffed, and under Chatmon's physical control over his movements tends to weigh in Ward-Minor's favor when considering the totality of the circumstances.

Here, Ward-Minor was ordered out of the car, handcuffed, and physically restrained by the officer, who told him to "stop moving" so much and repeatedly insinuated that he had contraband. Up to that point in the encounter, Chatmon's own testimony shows that his requests—to roll down the window, to open the door, to step out of the car, and so on—were in fact commands. This was true regardless of how they were phrased. For example, when Chatmon said, "Do me a favor, take a step—step out for me real quick," he was, in fact, issuing an order to step out of the car. While the order to get out of the car was itself perfectly legal, *see supra* note 2, Chatmon's response to Ward-Minor's attempt to question that order—the "Supreme Court says in a traffic stop, everybody has to come out of the car, okay, *if the officers*

---

and handcuffing weigh against voluntariness but do not preclude a finding of voluntariness).

*ask*" (emphasis added)—further blurred the distinction between a request and an order.

While these circumstances do not preclude a finding of voluntariness, they do provide crucial context in which we must view Ward-Minor's purported manifestation of consent. "Consent may be implied, but this requires an affirmative act by the individual about to be searched." *Hawkins*, 248 A.3d at 129; *see also United States v. Taylor*, 60 F.4th 1233, 1243 (9th Cir. 2023) ("[C]onsent can be inferred from conduct, such as a head nod."), *cert. denied*, 144 S. Ct. 828 (2024). Even in the absence of "overt duress or coercion" or any particular characteristics of the defendant undermining "the ability to freely consent," the government still must show a "statement of free and voluntary consent, not merely a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request." *Worley*, 193 F.3d at 386. We thus turn to the specific findings regarding the manifestation of assent.

Judge O'Keefe found that Chatmon stated his intent to search ("I'm going to check you . . . ") and followed it with a question ("that's cool?"). That finding is not clearly erroneous. Although perhaps not phrased as one, the latter half of that

statement was at least "inflected as a question."[9]  *T.W. v. United States*, 292 A.3d 790, 793 n.1 (D.C. 2023).  (We note that the trial judge recounted the question as "Is that okay?"  However, even assuming that is a "subtle discrepancy, we rely on the statement as clearly reflected in the video footage."  *Id.*)

Judge O'Keefe at times suggested that Ward-Minor gave both a verbal and a non-verbal response.  However, insofar as he found that there was a verbal response, that finding is without support in either the BWC footage or Chatmon's testimony.[10] *See supra* note 6; *Hawkins*, 248 A.3d at 130-31.

Thus, the finding on which our review turns is that Ward-Minor consented with a head nod.[11]  That he nodded is adequately supported, both by Chatmon's testimony on cross-examination and by the apparent movement of Ward-Minor's dreadlock in the video footage.  However, Judge O'Keefe made no explicit findings

---

[9] As the government notes, defense counsel expressly conceded below that the latter half was a question.

[10] The government does not suggest otherwise, but nevertheless argues that this point was conceded below, because defense counsel said "I think he says something maybe like 'yeah' or something like that, Your Honor."  We do not take this tentative and ambiguous statement as a binding concession.

[11] While Judge O'Keefe also observed that Ward-Minor said something about spreading his legs and set himself up to be searched, there has been no suggestion by the government or the judge that this, on its own (i.e., without the nod), was enough to carry the government's burden of proving consent.

about the timing of the nod with respect to Chatmon's statement and question. Upon our careful review of the video footage, we are firmly convinced that the head nod (as indicated by the movement of Ward-Minor's hair) was contemporaneous with, if not before, the word "that's" and undoubtedly before "cool." Thus, insofar as the trial judge implicitly found that the nod followed the question, that finding is clearly erroneous.

Because the nod came before "that's cool?," the government proved at most that Ward-Minor nodded in response to "I'm just going to check you real quick, okay, make sure you don't have nothing on you." The trial court found, and it is undisputed on appeal, that this was a statement, not a question.[12] The nod could not have been an affirmative response to a question not yet asked. *See Hawkins*, 248 A.3d at 130 ("While there are no per se rules for how much time an individual must have to consider whether to consent to a search, surely *some* opportunity to grant or deny consent is necessary."). At least under the particular circumstances of this case, the nod, coming before any question had been posed, was insufficient to establish anything more than acknowledgement of Chatmon's statement that he intended to

---

[12] The government acknowledged at oral argument that "that's cool"—rather than the "okay" following "real quick"—was the operative question and the basis for the trial court's finding of consent. The trial court also did not place any significance on the word "okay," nor, in our review of the video footage, does it seem to have been inflected as a question.

search. Thus, it was not affirmative, voluntary consent to be searched, but rather acquiescence to the officer's authority.

For the reasons explained above, we cannot agree that the government carried its burden of proving that Ward-Minor freely and voluntarily consented to be searched, and, based on the record as a whole, we are left with a definite and firm conviction that a mistake has been committed. *Anderson*, 470 U.S. at 573. Because the evidence obtained from the search should have been suppressed, and was the sole evidence against Ward-Minor on the firearm and ammunition charges, we reverse Ward-Minor's convictions.[13]

## III.  Conclusion

For the foregoing reasons, the judgment of the Superior Court is reversed, and this case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

[13] Because we reverse Ward-Minor's convictions on Fourth Amendment grounds, we need not address his alternative challenge to the denial of his motion to compel discovery in support of his motion to dismiss on equal-protection grounds.